308 Ga. 238
FINAL COPY

S19A1130, S19X1131. THE STATE v. GATES; and vice versa.

BETHEL, Justice.

In these cases, both the State and Johnny Lee Gates appeal from the grant of Gates' extraordinary motion for new trial by the trial court. In Case No. S19A1130, the State argues that the trial court abused its discretion when it determined that Gates should receive a new trial because of the discovery of new DNA evidence that is material and exculpatory. The State also argues that the trial court erred when it also appeared to grant Gates' extraordinary motion on the basis of *Arizona v. Youngblood*, 488 U. S. 51 (109 SCt 333, 102 LE2d 281) (1988), due to destruction of evidence by the State. In Case No. S19X1131, Gates cross-appeals, arguing that the trial court should have also granted him a new trial on his claim that the process by which the jury at his 1977 trial was selected was marred by racial discrimination. Because we find no abuse of the trial court's discretion in its grant of a new trial to Gates on the basis

of the newly discovered DNA evidence, we affirm that judgment in Case No. S19A1130. In light of that determination, we need not consider the State's argument in Case No. S19A1130 relating to Gates' *Youngblood* claim or the arguments raised by Gates in Case No. S19X1131.

1. *Trial and Sentence.*

On February 1, 1977, Gates, an African-American male who was then 21 years old, was charged by a Muscogee County grand jury with the murder, rape, and armed robbery of Katharina Wright, a 19-year-old white female. In the late summer of 1977, after a three-day trial held before an all-white jury, Gates was found guilty on all counts and sentenced to death.

The evidence presented at trial showed the following.[1] Just

---

[1] Because we are not reviewing Gates' conviction on direct appeal, we do not review the evidence presented at trial in the light most favorable to the jury's verdicts under the familiar standard set forth in *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). Instead, because this case involves appeals from a grant of a new trial on the basis of newly discovered evidence, we must consider how a reasonable juror would probably weigh the newly discovered evidence in light of the evidence presented at trial. See *Debelbot v. State*, 305 Ga. 534, 541 (2) (826 SE2d 129) (2019); *Timberlake v. State*, 246 Ga. 488, 491 (1) (271 SE2d 792) (1980). Thus, we must take account

before 1:30 p.m. on November 30, 1976, Wright was found dead in her apartment by her husband, an Army service member who, at the time, was stationed at Fort Benning. He found Wright lying on the floor of the apartment with an apparent gunshot wound to her head. There was blood on the floor beside her head. Her hands had been tied behind her back with a white bathrobe belt and a black necktie, and she had three other neckties wrapped around her face.

Wright's husband also noticed that the contents of Wright's purse had been dumped out, the sheets had been pulled off the couple's bed, and $480 in cash had been taken from under the mattress in the apartment. Wright's husband testified that the $480 was "all twenties," that this was the only cash that was in the apartment, and that he had placed it under the mattress the night before. According to Wright's husband, there was no sign of forced entry to the apartment. He testified that he did not have sex with Wright on November 30 or the evening before.

of all evidence presented at trial, including evidence which was not favorable to the verdict. See *State v. Denson*, 306 Ga. 795, 795 (1) n.1 (833 SE2d 510) (2019).

Wright's husband called the police, and officers arrived at the scene a few minutes later. One officer testified that he photographed the scene and attempted to find latent fingerprints in the apartment.[2] He testified that he dusted several areas of the apartment but that he did not dust the apartment's heater or the closet in which it was housed. The officer testified that fingerprints typically do not last more than two or three weeks and that they "start drying up" and are "harder to get" after that period of time. He found no usable prints when he searched Wright's apartment on November 30, 1976.

Wright's body was examined and photographed at the scene. An investigator with the Columbus Police Department testified that, when she examined Wright's body, she noted that three black neckties had been tied in tight knots around Wright's face. The investigator also noted that a white bathrobe belt and another black

---

[2] On cross-examination, the officer stated that he was not asked to look for pubic hair, that he did not take samples of the blood stains on Wright's clothing or the carpet to have them analyzed, and that he did not search for bullet fragments.

necktie had been used to bind Wright's hands and wrists. The belt had been tied "very, very tightly" around Wright's hands and wrists, and the necktie had been knotted around her wrists.[3]

The medical examiner testified that Wright suffered one gunshot wound to the head, which caused her death, and bruising on her left thigh. A gynecologist testified that Wright suffered other injuries that were consistent with sexual assault and that there was evidence that Wright had sexual intercourse on the day she was killed.[4]

One of Wright's neighbors, Donald Hudgins, testified at trial

---

[3] The investigator initialed and marked the belt and the tie that was knotted around Wright's wrist. Although all four ties were shown to the jury, only the tie that had been marked by the investigator was entered by the State as an exhibit. The trial court sustained Gates' objection to the entry of the other ties into the record because the State failed to prove a chain of custody for those items.

[4] The gynecologist also testified that she was asked to limit her investigation as to whether Wright had been sexually assaulted. She testified that she "did not perform a thorough examination" because she was told by an assistant district attorney that Wright would be subject to an autopsy. However, while examining Wright's pelvis, the doctor obtained loose pubic hairs, which she provided to a police officer who was accompanying Wright's body. She did not test the hairs, but she noted that they were a "lightish, blondish, brown color." She also testified that she extracted sperm from Wright's vagina and placed it on a slide but that she did not perform any tests on the sperm sample.

that, around noon on the day Wright was killed, a black male who he was "absolutely positive" was between 23 and 27 years old and five feet nine inches or five feet ten inches in height knocked on his apartment door. Hudgins testified that the man told him he was "from the gas company" and that he needed to turn off the gas in Hudgins' apartment. Hudgins further testified that, the next day, he read in the newspaper that Wright had been killed at the apartment complex. He then reported to the police that someone had come to his apartment around the time Wright was killed.

Two months later, on the afternoon of January 31, 1977, Hudgins was asked by detectives to view a live lineup of five suspects at the police station. Hudgins originally viewed the lineup from behind a two-way mirror, but he then requested to see the men in the lineup "face to face." In addition to being viewed by Hudgins, each participant in the lineup was asked to say, "I'm from the gas company." In that lineup, Hudgins identified Gates as the man who came to his apartment on the day of Wright's death. At trial, Hudgins also identified Gates in the courtroom.

On cross-examination, Hudgins admitted that Gates was two to three years younger and four to five inches shorter than the person Hudgins described during his direct testimony regarding the man who came to his door. Hudgins also testified that, of the four other people in the live police lineup besides Gates, one was "considerably taller" than Gates and one was "considerably heavier."

The detective who conducted the lineup later testified that, after conducting the lineup, he and Gates saw Hudgins in the hallway of the police station. The detective testified that Gates said, "I know that man. That was the man that I told I was from the gas company."

That same afternoon, Gates was interviewed by another detective at the police station. The detective learned that Gates had only a sixth-grade education. Gates was given *Miranda* warnings,[5] and after signing a waiver-of-rights form, he spoke with the detective. The detective told Gates that he wanted to talk to him

---

[5] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

about the investigation of Wright's death and told Gates "some of the things that had been found out during the investigation of the case, which indicated that [Gates] may have been the subject that was wanted." According to the detective, Gates then admitted to killing Wright and gave some details about the commission of the crime. The detective reduced Gates' statement into a typewritten account, and Gates signed it.

That statement was entered into evidence at trial. In it, Gates stated that, on November 30, 1976, he obtained a gun from a man named James Taylor because he was planning a robbery. He then went to Wright's apartment complex where he first encountered a white man matching Hudgins' description. Gates told the man that he was from the gas company and that his gas might be off for a little while. After he spoke with the man, he went to Wright's apartment and knocked on the door. Wright came to the door, and Gates told her that he was with the gas company. Wright told Gates "that she called [the gas company] yesterday." Wright let him in the apartment and told him that she wanted him to fix the fan on her

heater. She gave him a can of oil, and he began oiling the belt of the fan.

According to Gates' statement, he then threatened to rob Wright. She said that she had no money and that all he could get from her was sex. Gates then had sex with Wright and again demanded to know where she kept her money. Wright then gave him $500 — $300 from under the mattress and $200 that had been hidden behind a tape player in the living room.[6] Gates then told Wright to go back to the bed. Wright sat down on the side of the bed, and he tied her hands behind her with the belt from her bathrobe. He then used two black neckties he found in a dresser drawer to cover her eyes and mouth. Wright then kicked Gates and told him that she would "identify" him. He then shot her in the head. As he fled the room, he noticed that she was still sitting on the side of the bed.

After Gates signed his typewritten confession, detectives asked

---

[6] Wright's husband testified on cross-examination that he was not aware of whether Wright kept money behind a stereo in the apartment.

Gates if he would go to Wright's apartment with them. Gates agreed, and when they arrived there around 4:00 p.m. on January 31, the detectives asked Gates to describe what happened there. At 4:10 p.m., the detectives began video-recording Gates as he spoke to them in the apartment. That recording was played for the jury at trial. In it, after again receiving *Miranda* warnings, Gates recounted a story similar to that set forth in the typewritten confession. In the recording, however, he said that Wright did not resist him in any way when the two had sex. Gates also said that Wright gave him $480 in cash when he demanded money after they had sex — $300 "in twenty dollar bills" from under the mattress and an additional $180 from behind a tape player in "twenties, fives, and ones." He told the detectives that he tied her hands behind her back with the belt from her robe and that he tied two black neckties around her face. He said that, after he fled the apartment, he returned the gun to a man named James from whom he had borrowed the gun. He could not recall James' last name. On cross-examination at trial, two of the officers who accompanied Gates through the apartment

denied that they or anyone else from the police department had previously taken Gates through Wright's apartment or that anyone from the department had asked or instructed Gates to touch the apartment's heater.

Two latent fingerprints were lifted from the heater in Wright's apartment later that afternoon. Police subsequently determined that they matched Gates' fingerprints. The technician who lifted the prints testified that one of the detectives called him around 4:00 that afternoon, asked him to come to the apartment, and, upon his arrival, directed him to dust the heater for fingerprints. He was not asked to dust any other location in the apartment. The technician testified that it was rare for fingerprints to survive on a surface for more than two or three weeks. According to the technician, the fingerprint he removed from the heater had been placed there "recent[ly]" but more than "a matter of minutes or hours" before. The technician testified that the prints were of a high quality, which was unusual for prints that had allegedly been left two months prior. But he noted that he had been able to lift the prints because they had

"crystallized" onto the surface of the heater, a phenomenon the technician had not previously witnessed. The technician testified that this was possible because Gates had handled an oil can before touching the heater.

After the State rested, Gates elected not to testify. He called no witnesses and placed no exhibits into evidence. The jury found him guilty on all counts, and he was sentenced to death.

2. *Post-Conviction Proceedings.*

This Court affirmed Gates' convictions and sentence on direct appeal. See *Gates v. State*, 244 Ga. 587 (261 SE2d 349) (1979). Gates then unsuccessfully sought state and federal habeas corpus relief during the 1980s. See *Gates v. Zant*, 863 F2d 1492, 1496 (II) (11th Cir. 1989). As part of his federal habeas corpus petition, Gates filed a motion to expand the record to include, among other things, the official report from the GBI Crime Lab dated December 10, 1976. That report reflected that, on December 1, 1976, the crime lab received, among other items, "one manila envelope sealed with scotch tape containing four black neck ties and one white cloth belt."

The record does not reflect any request on Gates' part to actually obtain these items as part of his federal habeas proceeding.

On October 31, 1989, Gates filed a second habeas corpus petition in state court, seeking a psychological evaluation and claiming that he was ineligible for the death penalty due to an intellectual disability. His request for an evaluation was granted on March 19, 1990, and a psychologist submitted an affidavit on March 16, 1992, in which she outlined her determination that Gates suffered from "mental retardation," as defined at the time in OCGA § 17-7-131 (a) (3), based on his social history, his "repeated academic failure," and his consistently low performance on intelligence and adaptive behavior tests. Based on that evaluation, on April 14, 1992, the state habeas corpus court found that Gates was entitled to a jury trial to determine whether he was intellectually disabled and thus ineligible for the death penalty.[7] See *Fleming v. Zant*, 259 Ga. 687,

---

[7] The habeas court specifically advised Gates that a claim of jury discrimination in jury selection that he had also raised in the proceeding was not being decided in that hearing but that such claim could potentially be brought after his intellectual-disability hearing in a proper habeas court.

690 (3) (386 SE2d 339) (1989) ("[U]nder the Georgia Constitution, the execution of the mentally retarded constitutes cruel and unusual punishment.").

Proceedings in preparation for that trial stretched for more than a decade, as the parties slowly litigated a number of issues, including the State's assertion that Gates was in need of further psychological evaluation and the question of whether the State could use evidence from the 1977 trial (including Gates' confessions) in the intellectual-disability trial. During those pre-trial proceedings, Gates' counsel requested an inventory of the evidence that had been collected from the crime scene.

At a hearing held on October 8, 2002, the State indicated that it had in its possession the "physical items" introduced in "the original case," which it had received "from the court reporter." However, the record does not clearly reflect what items were in the State's possession in the courtroom that day other than photographs

and transcripts.[8] Gates' counsel insisted that the trial court hold an

---

[8] The hearing primarily concerned whether the parties would be permitted to use the videotaped confession that Gates gave to police in 1977 in his pending intellectual-disability trial, but Gates' attorneys contended that they should also have access to all of the other evidence collected in the case, which they believed included a rape kit, blood and hair samples collected from the apartment, and all clothing and bedding removed from the apartment. As part of that discussion, the prosecutor stated that his office had "located the trial evidence in the case . . . and some other photographs that were not admitted into evidence." The prosecutor then stated that "as far as rape kits and that sort of thing, we don't have any or hadn't been able to locate that." The prosecutor later stated, "[w]e've got the original trial evidence."

After a discussion regarding the transcripts of statements of two police officers regarding their investigation of another suspect in the case, which the prosecutor had brought to court that day, the court asked the prosecutor, "This is all the evidence that's available?" The prosecutor replied, "Except for some more photographs which are in my file." Gates' counsel then replied that "if it's not, if it was available and it's not available now, we're entitled to an evidentiary hearing to find out where it went to, why it went, who sent it, and for what purpose." The court then asked the prosecutor, "Is this all the evidence in the case?" to which the prosecutor replied, "Physical items that could be introduced? . . . In the original case, that's all there is, Your Honor . . . That I'm aware of." The prosecutor then noted that those items were "all that went in the original trial" and that the only other items he had on file were "more photographs." The prosecutor then noted that police reports created during the 1976-1977 investigation contained lists of other items of "evidence collected" but that the district attorney's office was not in possession of anything else: "I've looked for everything — I've called the evidence room. They don't have anything. I've called the crime lab. They don't have anything. We've looked in our vault. We don't have anything. We got the trial evidence from the court reporter. And that's all we've got, except [five or six] other photographs in our file."

The trial court and the attorneys then examined a document which apparently listed everything the prosecutor believed was in the possession of his office, which he described as "what evidence went in in the original trial plus a few other things and that's all we've got." The prosecutor indicated that "it's all in a manila envelope in our office." The trial court then asked, "[T]here

evidentiary hearing to determine what additional records and items the State had in its possession during the case and where those records and items were currently located (or when and by whom they had been destroyed). The court granted that request.

Gates subpoenaed the Muscogee County District Attorney, the GBI, and the Columbus Police Department asking that each agency produce documents and physical items in their possession related to Gates' case. Those subpoenas, all of which were issued on October 25, 2002, specifically requested that the State produce "all items of clothing, including but not limited to panties, robes, ties, and belts,

---

is no more than this?" The prosecutor replied, "[T]here is certainly no more than this, and this came out of the back of the transcript." The prosecutor then retrieved a manila envelope from his office and brought it to the courtroom where he, the judge, and Gates' counsel then apparently located each item on the prosecutor's list. The trial court then asked the prosecutor, "[T]hese photographs plus everything in that bag constitutes everything that you know of . . . as tangible evidence?" The prosecutor then confirmed his belief that the items in the folder, which included at least 15 photographs, were the only "tangible evidence" from the case "in existence at the present time."

The record reflects that, at trial, the State presented 16 exhibits. Of those, 14 (Exhibits 1-6, 8, and 10-16) consisted of photographs of the victim, the crime scene, and fingerprint evidence, totaling 15 photographs. The remaining exhibits were the belt and necktie admitted by the court (Exhibit 7) and the video of Gates' confession in the apartment (Exhibit 9).

remove[d] from the body of [Wright] and the test results relating thereto."

At an evidentiary hearing held on November 8, 2002, a representative of the Columbus Police Department testified that no physical evidence was in the possession of the police department but that it was in possession of documents relating to Gates' case. The representative testified that he was not aware of the existence of any other items relating to the case. Later in that hearing, Captain Clifford Hillhouse of the police department testified that he was one of the primary investigators in Gates' case. He testified that the typical practice of the department at that time was to collect physical items of evidence and send them to the crime lab, a procedure he followed in Gates' case. It was also standard practice for the crime lab to issue a report listing all items received from the department for a particular investigation. Among the items Captain Hillhouse collected and sent to the crime lab were the neckties that had been used to bind Wright. According to Captain Hillhouse, the only items of evidence that remained with the police and the district

attorney throughout the case were the copies of Gates' confessions and the fingerprint cards taken from Wright's apartment.

Later in the hearing, Benny Blankenship, formerly of the GBI Crime Lab, was called to testify. The State's records for Gates' case contained a document entitled "Record of Evidence Received by the Crime Laboratory." That document listed "Item 3" as "4 black neck ties and 1 white cloth belt." The document also contained the following stamped notation: "DESTROYED May 2 1979." Blankenship testified that the evidence listed in that document was destroyed because no agency representative had responded to a previous request from the GBI crime lab as to whether to hold or destroy the evidence.[9]

Gates also called Terry Mills of the GBI's Division of Forensic Sciences, who testified that, at that time, there was no evidence in

---

[9] Blankenship testified that the standard practice at the time was, for items of evidence more than two years old, to alert agencies which had submitted the evidence that such evidence would be destroyed unless they responded with instructions indicating that the evidence should be retained. It was his recollection that, at the time, such alerts were sent to police departments and possibly to district attorneys' offices.

the GBI's possession in any laboratory facility. Mills testified that "most of the evidence" in the custody of the GBI was destroyed by the crime lab on May 2, 1979, except for items listed as numbers 9, 10, 11, 26, and 27 on the "Record of Evidence Received by the Crime Laboratory," which were weapons, bullets, and other items recovered from the crime scene that had been returned to the Columbus Police Department. He also noted that "all blood evidence" relating to the case was destroyed in 1998. Another witness from the GBI testified that Item 4 on the list — a glass tube containing a projectile — was destroyed by the GBI in 1992.

During the hearing, the prosecutor also indicated to the trial court that he had looked through the evidence safe in the office of the district attorney. He indicated that "everything we've got is in this box right here, and it's already been shown to [Gates and his attorneys]." He went on to note that "the only thing we've got is what's in this sack here, plus a few pictures that the other side has

already seen."[10]

In November 2003, the trial court finally conducted an intellectual-disability trial. On the seventh day of that trial, the court declared a mistrial. Later that day, Gates and the State agreed to remove the possibility of a death sentence based on his conviction for Wright's murder, and Gates was resentenced to serve life in prison without the possibility of parole.

Gates contacted his current attorneys in 2015. After agreeing to represent him, they sought to find documents that would allow them to trace the location of any physical evidence collected from the crime scene in 1977, including any records of destruction.

On July 30, 2015, several interns for Gates' attorneys went to

---

[10] In a later hearing held on December 12, 2002, Gates' counsel noted that "we learned in November for the first time we got solid evidence that . . . we cannot do DNA testing on biological material because it's been destroyed. . . . We did not know for sure one way or another whether the evidence existed until then." Later in that hearing, in response to the suggestion by Gates' counsel that the district attorney's office had destroyed evidence from the original investigation of the case, the assistant district attorney pointed out that it was not the office of the district attorney who had destroyed these items: "We haven't destroyed anything. We have preserved everything in this case that I'm aware of and what is missing is destroyed or was damaged by somebody else."

the district attorney's office in Muscogee County to search for records regarding destruction of physical evidence from Gates' trial. While there, the interns located a white bathrobe belt and four black neckties inside a manila envelope that were later confirmed to be the items introduced at Gates' 1977 trial.

On August 17, 2015, Gates filed an extraordinary motion for post-conviction DNA testing of the belt and ties and for a new trial. The trial court held a hearing on the motion and granted Gates' motion for DNA testing pursuant to OCGA § 5-5-41 (c) on December 16, 2015.[11]

---

[11] The State has also suggested that Gates' counsel acknowledged in the December 16, 2015 hearing that the belt and ties were brought to the October 2002 hearing by the assistant district attorney. However, it is not clear that this is what Gates' counsel did.

The record shows that, early in the hearing, the prosecutor recounted to the trial court the State's belief that the belt and ties had been shown to Gates' attorneys. The prosecutor stated:

There is a lot of language in the transcripts about dumping the manila envelope out and going through its contents and about a list of listing all the items in the manila envelope. Unfortunately, it doesn't appear what was on that list was ever put into the record. So I believe it was the same envelope we're looking at now, but I can't say for sure. . . . [S]ome of the items in the envelope were admitted to trial and the whole envelope went with the Court Reporter as far as we can tell.

Later in the hearing, it appears that Gates' counsel was attempting to

In a letter and motion filed June 23, 2016, and December 7, 2016, respectively, Gates advised the trial court that testing of the items by the GBI showed the presence of at least three individuals' DNA on the belt and one of the ties but that the GBI was "unable" to conduct further analysis of the results with the methods then in

---

establish that the items had been in the possession of the State since they were collected at the crime scene and that they were in a condition that would permit them to be tested for DNA evidence. Gates' counsel then discussed the evolution of DNA testing since the early 2000s to now include touch DNA. Gates' counsel stated, "So . . . in 2002 at the hearing . . . when this envelope was brought into the court and the contents put out on the table . . . even at that time, there was no potential to get DNA off of those items, this is a fairly new technology." The trial court then asked Gates' counsel whether the belt and tie had been brought into court as evidence in the 2002 hearing. Gates' counsel replied, "Right. This — it was brought in in 2002 and the transcript which again [the prosecutor] referred to this as well, it's not clear from the transcript whether this is the same envelope. It seems that it was and it seems that an inventory was made of the items in the envelope, but it doesn't appear on the record." After the trial court attempted to clarify whether an inventory had been made at the hearing, Gates' counsel replied, "Yes, in 2002 of the items in this particular envelope I believe. But it doesn't appear on the record exactly what was in the envelope at the time. . . . So yes, it was brought to court in 2002. At that time, there was no testing that could have been done on those items not until 2007 or [2008] when the GBI began doing what they call contact DNA testing." Gates' counsel then went on to argue that "there was nothing that could have been done with that evidence as there is now today."

Later, in the closing argument for the hearing, the prosecutor said, "We know in 2000 — or we believe — I believe in 2002 that all the contents were opened up and an inventory taken of them." The prosecutor went on to argue that the repeated handling of the items since 1977 had likely contaminated the items to the point where DNA testing would not yield results that could establish a reasonable probability that Gates would have been acquitted.

use by the GBI. Gates indicated to the trial court that he intended to work with a defense DNA expert to obtain further analysis.

On February 1, 2017, the trial court ordered further testing of the DNA found on the belt and tie by the GBI and comparison of the results of that testing with a DNA reference sample taken from Gates. The trial court also permitted Gates to analyze the results and comparison through probabilistic genotyping software known as TrueAllele. That analysis was conducted by a company known as Cybergenetics. The GBI's initial analysis of the DNA samples was inconclusive, but the TrueAllele analysis excluded Gates as a contributor to the DNA mixture found on the belt and tie.

On November 27, 2017, Gates amended his extraordinary motion to include claims concerning jury discrimination, destruction of evidence, and suppression of evidence that Gates had been walked through the crime scene by police before he gave his videotaped confession. Gates also sought discovery of the State's jury selection notes from his 1977 trial.

At a hearing on January 31, 2018, the trial court ordered the

district attorney's office to locate and produce to Gates all of its materials and information concerning jury selection in his trial and six other capital cases in the late 1970s involving African-American defendants in the Chattahoochee Judicial Circuit, of which Muscogee County is a part. Pursuant to that order, the State disclosed its jury selection notes from those trials to Gates. Comparison of those notes against vital records and other information identifying the race of prospective jurors reflected that, in multiple cases, the prosecutors labeled the prospective jurors by race, sometimes labeling prospective white jurors with a "W" and prospective African-American jurors with a "B" or "N" and sometimes placing a dot beside the names of prospective African-American jurors. In one case, prosecutors had also tallied the race of the members of the final jury panel, with twelve marks in the "white" columns and zero marks in the "black" columns. In six of the seven cases, including Gates' trial, every black juror was struck, and the defendants were tried before all-white juries. In the seventh case, every juror except one was white.

On March 19, 2018, Gates further supplemented his extraordinary motion, and the trial court held an evidentiary hearing on May 7 and 8, 2018. The trial court granted Gates' extraordinary motion for new trial on January 10, 2019, on the basis of the newly discovered DNA evidence. It denied relief to Gates on all of the other claims he asserted.[12] The State filed a notice of appeal on February 8, 2019, and Gates filed a notice of cross-appeal on February 18, 2019. These cases were docketed to this Court's August 2019 term, were orally argued on August 20, 2019, and have been consolidated for opinion.

We turn now to a consideration of the arguments raised on

---

[12] Specifically, the trial court found that Gates had failed to satisfy the diligence requirement in *Timberlake* as to his claims for discrimination in jury selection and a claim regarding evidence that Gates had been walked through the crime scene by police before a second walk-through in which he gave a videotaped confession. The trial court also determined that Gates had not shown that the State had suppressed evidence of the alleged prior walk-through of the crime scene in violation of *Brady v. Maryland*, 373 U. S. 83 (83 SCt 1194, 10 LE2d 215) (1963). Although the trial court noted the concerning nature of the State's history of destroying evidence in the case, including blood evidence taken from the scene which the court characterized as "material and exculpatory" under *Youngblood*, the trial court's order stated that Gates' motion was granted "on the new DNA findings pursuant to OCGA § 5-5-41 (c)" and that Gates was "denied relief on all other grounds alleged in his Extraordinary Motion for New Trial."

appeal. We begin with the State's appeal from the trial court's grant of Gates' extraordinary motion for new trial.

3. For claims cognizable in extraordinary motions for new trial based on newly discovered evidence, OCGA § 5-5-41 (a) specifies that "[w]hen a motion for new trial is made after the expiration of a 30 day period from the entry of judgment, some good reason must be shown why the motion was not made during such period, which shall be judged by the court." "[T]he procedural requirements for such motions are the product of case law." *Dick v. State*, 248 Ga. 898, 899 (1) (287 SE2d 11) (1982).

As this Court set forth in *Timberlake v. State*, 246 Ga. 488, 491 (1) (271 SE2d 792) (1980):

> It is incumbent on a party who asks for a new trial on the ground of newly discovered evidence to satisfy the court: (1) that the evidence has come to his knowledge since the trial; (2) that it was not owing to the want of due diligence that he did not acquire it sooner; (3) that it is so material that it would probably produce a different verdict; (4) that it is not cumulative only; (5) that the affidavit of the witness himself should be procured or its absence accounted for; and (6) that a new trial will not be

granted if the only effect of the evidence will be to impeach the credit of a witness.

(Citation omitted.) Id. "Failure to show one requirement is sufficient to deny a motion for a new trial." Id. Extraordinary motions for new trial "are not favored, and a stricter rule is applied to an extraordinary motion for a new trial based on the ground of newly available evidence than to an ordinary motion on that ground." (Citation and punctuation omitted.) *Crowe v. State*, 265 Ga. 582, 590-591 (15) (458 SE2d 799) (1995).

In its appeal, the State argues that the trial court abused its discretion by finding that Gates exercised diligence under *Timberlake* in seeking the DNA evidence and that the DNA evidence was so material that it would probably produce a different verdict. We disagree with both contentions.

In its order granting Gates a new trial, the trial court conducted an analysis based upon the factors set forth in *Timberlake.* We review the trial court's findings of fact under the clearly erroneous standard, meaning that we uphold a factual

finding if there is any evidence in the record to support it. See *Singh v. Hammond*, 292 Ga. 579, 581 (740 SE2d 126) (2013). A trial court's ultimate ruling on such a motion "will not be reversed unless it affirmatively appears that the court abused its discretion." (Citations and punctuation omitted.) *Davis v. State*, 283 Ga. 438, 440 (2) (660 SE2d 354) (2008). We thus begin with a review of the trial court's findings of fact relating to the new DNA evidence.

At the May 2018 hearing, Gates presented the testimony of Dr. Mark Perlin, the CEO and chief scientific officer of Cybergenetics. Dr. Perlin, who holds a medical degree as well as doctoral degrees in mathematics and computer science, was qualified as an expert in DNA interpretation and probabilistic genotyping without objection from the State. Dr. Perlin testified that he is the creator of a DNA interpretation technology called TrueAllele, a software program that uses probabilistic genotyping to objectively interpret degraded, low-level, and complex mixtures of DNA. The TrueAllele program produces a statistic that indicates the likelihood that a given person's DNA profile is present or not present in a given DNA

sample. TrueAllele was first used in 2005 to analyze and identify the remains of victims of the September 11, 2001 attacks on the World Trade Center and, according to Dr. Perlin, was first used in a criminal case in 2008. TrueAllele was adopted by the GBI for its own casework in January 2018, and Dr. Perlin trained the GBI staff in the use of the program.

Dr. Perlin testified that the TrueAllele software determined that Gates is excluded as a contributor to the DNA mixture on the belt and tie that were tested. In its order granting Gates a new trial, the trial court explicitly credited this testimony. According to the State's theory at trial, that evidence, the bathrobe belt and one of the neckties recovered from the scene, had been used by the perpetrator to bind Wright's hands before she was killed.[13] In light

---

[13] There were four ties collected from the scene that had apparently been used to bind Wright — one around her hands and three others on her face. The tie that was tested pursuant to the trial court's February 1, 2017 order had a reddish-brown spot on it that was an apparent blood stain. Although unclear, the record suggests that Gates identified that tie as the one that had been used with the bathrobe belt to bind Wright's hands based on a photograph taken of Wright at the crime scene. That photograph was provided to Cybergenetics when it performed the TrueAllele analysis of the DNA found on the belt and tie, and the photograph was identified by Dr. Perlin and admitted into evidence at the May 2018 hearing on Gates' extraordinary motion for new trial.

of the role of those items in the perpetration of the crimes, the trial court found the TrueAllele analysis of the DNA evidence located on those items to be exculpatory.

The State called two witnesses at the hearing. Each testified that, following Gates' initial request for DNA testing, the GBI evaluated the DNA located on those items through human interpretation. That testing yielded inconclusive results. It was only later, through analysis with the TrueAllele software, that it was determined that Gates was not a contributor to the DNA mixtures located on the items. In its order, the trial court noted that this testimony showed that TrueAllele had the ability to interpret that which human interpretation methods could not. The trial court also noted that this testimony demonstrated why the TrueAllele software had been adopted by the GBI. The State did not contest the accuracy of the TrueAllele results in this case, and its witnesses testified that TrueAllele is "scientifically valid" in its approach to using data that cannot be comprehended or analyzed without the aid of computational software.

In response to Gates' extraordinary motion, the State argued that, in the years since 1979, it had stored the belt and tie in a way that Gates' DNA left on the items could have degraded, and that such DNA was simply no longer present on the items, perhaps because it had fallen off or otherwise been lost over the years. In its order granting Gates a new trial, the trial court rejected these arguments. It first noted that Dr. Perlin's testimony at the hearing established that the perpetrator's DNA "would be embedded" in the belt and tie because of the manner in which the murder of Wright occurred — namely, evidence at the 1977 trial established that the perpetrator tied the belt "very, very tightly" around Wright's hands, "bound her wrists," and double-knotted the belt. The tie was also tied and knotted around Wright's wrists during the commission of the crimes. Dr. Perlin testified that use of the belt and tie in this fashion would transfer a significant amount of DNA from the perpetrator's hands onto those items.[14]

---

[14] As noted above, the State connected Gates to the crime scene, at least in part, based on fingerprint evidence collected at the scene. Moreover, two

The trial court also determined that evidence presented at the 2018 hearing established that the GBI testing and TrueAllele analysis of the items yielded usable results, even if some of the DNA left on the items had degraded over time. The trial court determined that there was no indication that the DNA on the items had suffered total degradation due to bacterial growth or other reason. The trial court credited Dr. Perlin's testimony that while the DNA on the tested items had degraded to some extent over time, the sample still yielded results that could be (and were) reliably interpreted by TrueAllele. The trial court also credited Dr. Perlin's testimony that the TrueAllele software was able to accommodate for and reliably interpret degraded DNA samples and that the GBI's previous inconclusive findings were due to the limitations of human analysis of the DNA rather than the degradation of the DNA sample.

The trial court also credited Dr. Perlin's testimony that the

---

detectives rejected the suggestion that the fingerprints were left in Wright's apartment by Gates during an alleged unrecorded walk-through of the crime scene by law enforcement prior to his arrest. Thus, the State's theory of the case has consistently implied that Gates' hands were not covered at the time he committed the crimes.

perpetrator's DNA "would not" have transferred off the tie and belt simply because other individuals touched those items. Although one of the State's expert witnesses suggested that handling of the items over the years by multiple individuals (including taking the items in and out of manila envelopes) could have caused Gates' DNA to fall off, the trial court noted that the State's expert was unable to cite any study supporting this proposition.

The State also argued that, because many individuals had likely handled the items over the years, the fact that only three or four DNA profiles were located on the items by TrueAllele showed that the software could not account for the effects of repeated handling. The trial court likewise rejected this argument, noting Dr. Perlin's testimony that even if additional individuals touched the items, their DNA might be added to the items but that such handling would not remove the perpetrator's DNA. Dr. Perlin also testified that the DNA of a particular person who handled the items might not be added to the items if such handling only resulted in "casual" or "brief" touching of the items.

Based on the foregoing, the trial court determined that Gates had satisfied each of the six *Timberlake* factors with respect to the TrueAllele analysis of the DNA evidence and granted him a new trial. Specifically, the trial court found that the TrueAllele analysis of the DNA located on the belt and tie had come to Gates' knowledge since his 1977 trial. The trial court noted that both Gates and the State agreed that traditional human analysis of the DNA samples would not have led to (and did not yield) any meaningful interpretation of the samples but that analysis through the TrueAllele program did yield a meaningful interpretation.

The State argued that Gates should have secured DNA testing of the items much earlier. The trial court rejected that argument, noting that it was obligated under OCGA § 5-5-41 (c) (7) (C) to grant DNA testing only when it "would provide results that are reasonably more discriminating or probative of the identity of the perpetrator than prior results[.]" The trial court found that evidence at the hearing established that TrueAllele did just that, as the results of its analysis were more discriminating and probative of the identity

of the perpetrator than the GBI's prior human interpretation of the testing results from the samples.

The trial court also found that Gates had been diligent in his request for DNA testing because such request was made promptly after his attorneys' interns located the two items of evidence in the office of the district attorney in 2015. The trial court noted that although the State contended that the two items had apparently been present in court at a hearing in October 2002, the State represented at a hearing a month later that the two items had been destroyed in 1979.

The trial court also found that the DNA evidence was material to Gates' defense because it demonstrated that Gates was not the person who bound Wright. The trial court further determined that the TrueAllele analysis of the DNA evidence was not cumulative of other evidence available to Gates, that it did not merely impeach the credibility of a witness, and that Gates had satisfied the *Timberlake* affidavit requirement. Finally, the trial court found that the DNA evidence did not merely impeach the credibility of a witness.

Instead, the trial court found that the TrueAllele analysis provided substantive evidence that Gates did not commit the crimes of which he was convicted.

(a) The State first argues that the trial court abused its discretion when it determined that Gates had satisfied the "due diligence" requirement of *Timberlake*. We disagree.

(i) At the outset, the State argues that the trial court's factual finding that Gates and his defense team did not know about the continued existence of the belt and ties until 2015 is clearly erroneous. Although the trial court determined that these items were located in the district attorney's office in July 2015 by interns for Gates' attorneys, the State argues that Gates and his series of attorneys knew of the existence of these items since before his 1977 trial (in which they were admitted as exhibits) and that they did nothing to preserve them for testing until 2015. Specifically, the State argues that the record shows that in 1983, Gates' habeas counsel filed a motion with a GBI report showing the collection of these two items. The State goes on to note that it was not until 2002,

in preparation for Gates' intellectual-disability trial, that his counsel asked for an inventory of the evidence collected from the crime scene. The State also argues that the record supports its contention that it then brought physical items introduced in Gates' 1977 trial (including the belt and ties) to an October 8, 2002 hearing and showed these items to Gates' attorneys. Moreover, the State contends that the record does not support the trial court's finding that, in November 2002, the State represented that those items had been destroyed in 1979.

Contrary to the State's arguments, the record supports the trial court's determination that the ties and belt were not available to Gates for the relevant DNA testing and TrueAllele analysis until 2015. As discussed above, it is not clear from the record whether the prosecutor brought the belt and ties to the October 8, 2002 hearing.[15] However, the record shows that the State's records for Gates' case and testimony by a GBI official given in a November 8, 2002 evidentiary hearing indicated that the belt and ties admitted in his

---

[15] See footnotes 8 and 11 above.

1977 trial *were destroyed* by the GBI in 1979. Those items were not rediscovered by Gates' attorneys until 2015. Moreover, although Gates knew about the existence of these items at the time of his trial in 1977, touch DNA testing and TrueAllele analysis did not exist at the time, and indeed did not come into common use in the United States until the decades that followed. Thus, there would have been no basis at the time of his trial for Gates to request that such items be subjected to DNA testing or that those items be preserved for later testing.

We note that the same judge who ruled upon Gates' extraordinary motion for new trial has presided over Gates' case since 1996 and presided over the October 2002 hearing at which the State argues the belt and tie were shown to Gates' attorneys and the subsequent hearings at which the events of the October 2002 hearing were discussed. Because of its direct involvement in this case over a period of more than two decades, the trial court has been in a position to evaluate the ongoing conduct and the credibility of the parties and their attorneys, and as a result, we give substantial

deference to its factual findings. Cf. *Ford Motor Co. v. Conley*, 294 Ga. 530, 547 (3) (a) (4) (757 SE2d 20) (2014). See also *Resurgens, P.C. v. Elliott*, 301 Ga. 589, 598 (2) (b) (800 SE2d 580) (2017) (noting that, in the context of civil discovery, a trial court's finding that a party has failed to comply with discovery obligations will not be reversed if there is any evidence to support it because "unlike the appellate courts, the trial court directly supervised the ebb and flow of the discovery and trial process in the case and had the opportunity to observe and assess the conduct, demeanor, and credibility of the parties and their counsel throughout the proceedings." (citation and punctuation omitted)); *Singh*, 292 Ga. at 581 (2) ("In the appellate review of a bench trial, this Court will not set aside the trial court's factual findings unless they are clearly erroneous, and this Court properly gives due deference to the opportunity of the trial court to judge the credibility of the witnesses." (citation and punctuation omitted)). Although other judges might have viewed the record differently, the record supports the trial court's determination that Gates and his defense team did not know about the continued

existence of the belt and ties until 2015, that Gates and his counsel were entitled to rely upon the representations by the State that these items had been destroyed, and that they did so until interns for Gates' attorneys unexpectedly discovered these items in 2015. *Conley*, 294 Ga. at 548 (3) (a) (4) ("[W]hether the [movants] exercised due diligence in this case is a pretty close question, and the trial court could have reached a different conclusion, to which we likely also would have deferred. But the conclusion the trial court reached is supported by the record viewed as a whole."). Accordingly, we determine that this factual finding by the court was not clearly erroneous.[16]

---

[16] The State has also argued that, in a hearing held on December 12, 2002, Gates' counsel acknowledged having seen the belt and tie that were later tested and had argued that technology allowed those items to be examined for DNA evidence. However, the trial court, as factfinder, was empowered to reject the State's characterization of ambiguous comments made by Gates' counsel at the December 2002 hearing. The State notes that, in that hearing, Gates' counsel stated to the court, "We think it's unfair that they keep two pieces of evidence, [and] destroy most of the rest of it that could be shown[.]" But contrary to the State's assertion, Gates argues, and the record suggests, that this statement by counsel was not in reference to the belt and tie that were later tested. Although unclear, the trial court could infer that the "two pieces of evidence" referred to by counsel were the videotaped and typewritten confessions given by Gates to law enforcement during the investigation of

(ii) The State also argues that the trial court made a clearly erroneous factual finding when it found that Gates could not have secured analysis of DNA testing results with TrueAllele until that software program was adopted by the GBI in January 2018. But this argument appears to mischaracterize the trial court's factual finding. In its order granting Gates a new trial, the trial court noted that Gates and the State "agreed that TrueAllele was adopted by the GBI in January 2018." The trial court then went on to dismiss as "flawed" the State's contention that Gates could have earlier secured contact DNA testing, noting instead that analysis by TrueAllele was "more discriminating and probative of the identity of the perpetrator than prior results obtained by human interpretation of complex mixtures." These statements in the trial court's order are not a factual finding that Gates was unable to make use of TrueAllele

Wright's death. The State had given notice on June 14, 2002, that it would reserve the right to use the confessions in Gates' pending intellectual-disability trial. Those confessions were being discussed at the December 2002 hearing in the context of a motion in limine filed by Gates on November 18, 2002, seeking to exclude the use of the confessions in the trial, and they were specifically being discussed immediately before the comment regarding "two pieces of evidence" by Gates' counsel.

until it had been adopted by the GBI.

To the contrary, the record makes clear that Gates sought analysis of the GBI's testing results through TrueAllele in December 2016, more than a year before that software was adopted by the GBI for its own casework. The trial court's reference to the GBI's adoption of the technology seems simply to suggest the court's assessment that TrueAllele was not yet in wide use — even in Georgia's law enforcement community — at the time Gates first sought to use the software to analyze the DNA samples from the tie and belt. Thus, contrary to the State's assertion, the court made no finding that TrueAllele was not available to defendants like Gates until January 2018 when it was adopted by the GBI.

(iii) Having determined that none of the trial court's diligence-related factual findings challenged by the State were clearly erroneous, we turn to whether the trial court abused its discretion in finding that Gates satisfied that requirement of the *Timberlake* test. As we have previously stated:

The statutes which control extraordinary motions

for new trial based on newly discovered evidence require a defendant to act without delay in bringing such a motion. OCGA §§ 5-5-23 and 5-5-41. . . . The obvious reason for this requirement is that litigation must come to an end. . . . [T]he diligence requirement ensures that cases are litigated when the evidence is more readily available to both the defendant and the State, which fosters the truth-seeking process.

(Citation omitted.) *Drane v. State*, 291 Ga. 298, 304 (3) (b) (728 SE2d 679) (2012). A "mere assertion that the evidence could not have been discovered by ordinary diligence is insufficient." (Citation and punctuation omitted.) *Dick*, 248 Ga. at 900 (1). The record must support the trial court's determination that the defendant exercised diligence in seeking the new evidence.

The State argues that Gates has generally failed to account for the delay in bringing his motion for testing between 1977 and the rediscovery of the belt and ties in the district attorney's files in 2015. The State relies upon this Court's decisions in *Llewellyn v. State*,

252 Ga. 426 (314 SE2d 227) (1984),[17] and *Davis*, 283 Ga. at 440 (2),[18] for the proposition that Gates has failed to satisfy the diligence requirement due to the years-long delays in seeking to obtain physical evidence in the State's possession, seeking DNA testing and analysis of such items, and then bringing a motion for new trial on the basis of any new evidence discovered. For reasons discussed below, this argument is unavailing.

The State first argues that Gates should have brought his extraordinary motion much earlier, given the prevalence of DNA evidence in criminal proceedings since at least the 1990s.

---

[17] In *Llewellyn*, the defendant challenged his murder conviction in a 1978 direct appeal through the conclusion of federal habeas proceedings in 1980. *Llewellyn*, 252 Ga. at 427. In 1981, the victim's estate filed a wrongful death action against the defendant. During discovery in the civil action, the defendant learned that another person had admitted to killing the victim. In 1983, the defendant filed an extraordinary motion for new trial on the basis of this newly discovered evidence. This Court affirmed the trial court's denial of the motion, noting that the defendant had waited two years following the revelation of the exculpatory testimony before filing the extraordinary motion for new trial. Id. at 429 (2).

[18] In *Davis*, the defendant challenged his conviction in a 1993 direct appeal through the conclusion of federal habeas proceedings in 2006. In the early 2000s, the defendant obtained affidavits alleging his innocence, but did not file an extraordinary motion for new trial until 2007. This Court affirmed the trial court's denial of his extraordinary motion, noting that the defendant had not been diligent in presenting the affidavits to the trial court.

Specifically, the State argues that Gates should have sought testing as early as 2005 when the TrueAllele software was first used.

As the State implicitly concedes by that argument, however, the "newly discovered evidence" in this case is not simply the DNA found on the belt and tie, or even the GBI's initial inconclusive test results for them. Those items, that DNA, and those results, have little value to Gates' case because the GBI's human interpretation of the DNA results was inconclusive. It was instead the TrueAllele analysis of those results that yielded Gates newly discovered evidence on which he could stake a claim to a new trial. Because the record established that the TrueAllele software had the ability to provide probative analysis of complex and degraded DNA mixtures in a way that traditional human methods could not (and apparently, to this day, cannot), it was not necessary under *Timberlake* for Gates to have sought TrueAllele analysis of the DNA located on the belt and tie at any point prior to 2005 when TrueAllele was first used.

Moreover, as noted above, the record supports the trial court's determination that Gates and his counsel were not aware of the

continued existence of the belt and tie in 2005 or for a decade thereafter. As the trial court determined, Gates did not discover that the belt and ties were still in existence and available for testing until 2015 due to the State's representation to Gates and his defense team in 2002 that those items had been destroyed in 1979 and Gates' understandable reliance on that representation. Throughout that time, Gates had no cause to believe that such items even remained in existence, much less that they were available for DNA testing and statistical genotyping analysis through TrueAllele. Because the diligence requirement of *Timberlake* cannot operate to demand that a defendant seek DNA testing of items which he reasonably believes do not exist, the delay occasioned by the State's representation as to the destruction of those items cannot be counted against Gates. See *Bharadia v. State*, 297 Ga. 567, 570 (2) (774 SE2d 90) (2015) ("Good reason exists only where the moving party exercised due diligence but, due to circumstances beyond his control, was unable previously to discover the basis for the claim he now asserts." (citations and punctuation omitted)).

The record further shows that in 2015, within two weeks of discovering the belt and ties in the district attorney's files, Gates filed a motion seeking post-conviction DNA testing to be performed by the GBI and an extraordinary motion for a new trial. The testing ordered by the trial court and conducted by the GBI revealed that the belt and tie used to bind Wright's hands contained a DNA mixture from multiple contributors, which the GBI deemed "inconclusive" after human interpretation of the results (which was apparently the only method of interpretation used by the GBI at that time). In December 2016, Gates then requested — and the trial court ordered — further testing of the DNA samples from those items and analysis of such results with TrueAllele. The TrueAllele analysis revealed that Gates was not a contributor to the DNA mixture found on the belt or tie. Gates later made additional amendments to his extraordinary motion for new trial, and the trial court held a hearing on the motion in May 2018.

The record thus indicates that, once the continued existence of the belt and ties became known to Gates in 2015, he moved

expeditiously to utilize progressively more sophisticated DNA testing and analysis methods in search of new evidence. Gates then promptly sought a new trial on the basis of TrueAllele analysis of the DNA. Accordingly, we see no abuse of the trial court's discretion in its determination that Gates satisfied the diligence requirement of *Timberlake* with respect to the newly discovered DNA evidence.

(b) The State also argues that the trial court abused its discretion in determining that the new DNA evidence obtained through the TrueAllele analysis was so material that it would probably produce a different verdict. We disagree.

In weighing the materiality of newly discovered evidence, "we do not ignore the testimony presented at trial, and, in fact, we favor that original testimony over the new." *Davis*, 283 Ga. at 447 (4). However, we must also attempt to account for how the new evidence would have influenced the jury's assessment of the evidence presented by the State in his 1977 trial, had such evidence been available to Gates at that time. In so doing, we must "consider the strength and weaknesses of both the [S]tate's and the defendant's

case and the nature and strength of [the] defendant's new evidence." *Carl v. State*, 234 Ga. App. 61, 62 (1) (506 SE2d 207) (1998), disapproved on other grounds, *Schofield v. Holsey*, 281 Ga. 809, 811 (II) n.1 (642 SE2d 56) (2007). Although in the context of materiality we give some deference to the trial court's firsthand assessment of the newly discovered evidence, including the credibility of the witnesses who testified in regard to it, the question before us is not whether the trial court found the newly discovered evidence persuasive in light of the other evidence presented at trial, but whether "a reasonable juror" probably would. (Citation omitted.) *Debelbot v. State*, 305 Ga. 534, 541 (2) (826 SE2d 129) (2019).

The evidence presented against Gates at his 1977 trial was strong. The State presented two confessions given by Gates — one of which was videotaped — that were generally consistent with each other, as well as the testimony of an eyewitness, Hudgins, who placed Gates at the scene of the murder around the time it took place. Hudgins' testimony also corroborated Gates' statements regarding the "gas company" scheme Gates had planned to

effectuate a robbery. Hudgins positively identified Gates in a live police lineup and in court. Police also obtained fingerprints from Wright's apartment that were matched to Gates. The State presented testimony rebutting the suggestion by Gates' counsel on cross-examination and in argument that Gates did not understand what he was confessing to, that he was coaxed into confessing, and that he had been walked through the crime scene by police before giving his confession, leaving his fingerprints at the time. Gates did not testify, and he called no witnesses.

Nevertheless, the newly discovered DNA evidence now available to Gates casts significant doubt on the State's theory that Gates was the perpetrator. Although the results of the TrueAllele analysis and Dr. Perlin's testimony do not point to another specific individual who committed these crimes, that evidence directly undermines Gates' connection to a central assumption of the State's case: that the person who bound Wright's hands was the same person who murdered her. The testimony of Dr. Perlin establishes that the person who bound Wright in the manner suggested by the

testimony presented in the 1977 trial "would" have transferred DNA to the belt and tie used to bind her and that at least a portion of such DNA "would" have remained on those items to the present day. But the TrueAllele analysis has now excluded Gates as a contributor to the DNA mixtures found on those items. The trial court, which observed Dr. Perlin's testimony, found this evidence and the supporting testimony to be material and exculpatory.[19]

Our review of the record leads us to conclude that, like the trial court, a reasonable juror would probably afford significant weight to the TrueAllele analysis and Dr. Perlin's supporting testimony. As the trial court noted, the GBI has adopted TrueAllele for its own

---

[19] The trial court noted in its order that it found Dr. Perlin's testimony regarding the TrueAllele analysis of the DNA results to be "credible." It appears that this finding was more than a mere assessment of veracity and instead also included a finding that the testimony would be of significant weight and materiality to a reasonable juror. This sort of assessment of the witness's "credibility" is at most one factor to be considered by appellate courts in determining how a reasonable juror would probably weigh the newly discovered evidence against the other evidence presented at trial. However, because we agree with the trial court's overall assessment of the materiality of the newly discovered DNA evidence (including Dr. Perlin's supporting testimony), we need not articulate the standard of deference to be afforded to a trial court's "credibility" determinations in the context of assessing how a reasonable juror would probably weigh such evidence. See *Debelbot*, 305 Ga. at 541-542 (2).

casework, and Dr. Perlin trained GBI personnel in its use. Thus, any attempt by the State to challenge the validity of the software's analysis or the credibility of Dr. Perlin with regard to his assessment of the evidence in this case would likely fall flat before a jury, just as it did before the trial court. Had it been available to Gates in his 1977 trial, the TrueAllele analysis of the DNA found on the belt and tie would have opened a clear path for Gates to demonstrate and argue to the jury that he was not the person who bound Wright, and thereby directly attack a key aspect of the State's theory of the case.

In addition to broadly challenging the State's theory of Gates' role in Wright's murder, the TrueAllele analysis would have also aided Gates in challenging the key pieces of evidence presented by the State — Gates' confessions, Hudgins' eyewitness identifications, and the fingerprint evidence collected from the apartment. Although Gates' counsel attempted to attack the credibility of the State's witnesses at trial, those attacks had limited potency because Gates had no physical evidence contradicting the evidence presented by the State. Had the TrueAllele analysis been available, Gates'

counsel's questioning of the police regarding the methods by which they obtained his confessions, questioning of Hudgins regarding his identifications of Gates, and questioning of the technician who found Gates' fingerprints in the apartment would all have been received by the jury in light of powerful physical evidence that Gates did not commit the crimes. Had this evidence been available to Gates, it is probable that at least one reasonable juror would have had reasonable doubt about Gates' guilt.

We reach this determination in light of the growing body of judicial experience with DNA evidence and the manner in which it is received by jurors. As we have previously noted, DNA evidence is likely to be especially resonant with a jury, even in light of some contradictory testimony establishing the defendant's guilt. See *Boothe v. State*, 293 Ga. 285, 291-294 (2) (b) (745 SE2d 594) (2013) (noting the "powerful" nature of DNA evidence relative to other forms of evidence). See also *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U. S. 52, 55 (129 SCt 2308, 174 LE2d 38) (2009) ("DNA testing has an unparalleled ability both to

exonerate the wrongly convicted and to identify the guilty."). Even when the DNA evidence does not conclusively establish who committed a particular crime, it may nonetheless be probative evidence of a defendant's guilt or innocence. See *Haddock v. State*, 146 P3d 187, 205 (Kan. 2006) ("Because of its scientific precision and reliability, DNA testing can in some cases conclusively establish guilt or innocence of a defendant. In other cases, DNA may not conclusively establish guilt or innocence but may have significant probative value to a finder of fact.").

Even in the face of considerable evidence offered by the State, DNA evidence showing that the inculpatory evidence cannot be true may be sufficient to create reasonable doubt in the mind of a reasonable juror. As the Fifth Circuit has noted specifically with respect to confessions:

> Confessions are generally considered strong evidence of guilt, and a sound confession alone may significantly influence a juror's decision. Confession evidence (regardless of how it was obtained) is so biasing that juries will convict on the basis of confession alone. Nonetheless, the credibility of [the defendant's] confession must be evaluated in the light of the newly-

discovered evidence excluding the possibility [that the defendant] committed the crimes to which he confessed. It follows that, in the light of this newly-discovered contradictory physical evidence, it is more than likely a reasonable, informed juror would reasonably doubt the credibility of [the defendant's] confessions.

(Citations and punctuation omitted.) *Floyd v. Vannoy*, 894 F3d 143, 157-158 (II) (A) (2) (5th Cir. 2018).

Here, Gates highlighted a number of issues regarding the confessions at trial. First, the record reflects that Gates had only a sixth-grade education and that his initial confession, which was typewritten by the detective, was given in somewhat suggestive circumstances. Second, there are inconsistencies between the two confessions, as they differ as to the amount of money Wright gave to Gates. There are also inconsistencies between the confessions and the other evidence presented by the State. For instance, in his videotaped confession, Gates stated that he and Wright had consensual sex after he demanded money from her. But there was evidence that Wright suffered injuries consistent with sexual assault and rape. Wright's husband also testified that the only

money kept in the apartment was $480 in "all twenties," which he and Wright kept under their mattress. But, in addition to differing as to the amount of money Wright gave him, Gates' confessions indicated that Wright gave Gates money both from under the mattress and from behind a stereo that was also kept in the apartment. His videotaped confession also indicated that he received cash denominations other than twenty-dollar bills. Gates also indicated that he shot Wright as she sat on her bed and that she was still on the bed as he fled the apartment. But the record shows that Wright was found dead on the floor near her bathroom door, suggesting that she was not shot on the bed, as Gates claimed.[20] In both confessions, Gates said that he tied two ties around Wright's face, and he only mentioned using a belt to tie her hands. But the evidence at trial showed that three ties were found

---

[20] A police report dated December 4, 1976, indicated that the only blood found in Wright's apartment was "under her head." Although that report was not placed into evidence at trial, it is consistent with the trial testimony of Wright's husband who noted the presence of blood near Wright's head when he discovered her body in the apartment.

on Wright's face and neck and that a fourth tie was used with the bathrobe belt to bind her hands.[21] Moreover, as there is no indication that Gates actually worked for a gas company, his statement about Wright acknowledging to him that she had called the gas company the day before, while perhaps an extraordinary coincidence, was a very odd detail that was inconsistent with the theory that Gates posed as a gas company employee in order to gain entry to Wright's apartment. Finally, in his opening statement, the prosecutor told the jury that, before Gates had been identified, another person was identified as a suspect for Wright's murder but that he had not been indicted. In light of these issues, had the newly discovered DNA evidence in this case been available to Gates at trial, it would probably have caused the jury to afford less weight to Gates' confessions.

The newly discovered DNA evidence would probably also have

---

[21] We note that the trial court took note of at least some contradiction between the physical evidence produced at trial and Gates' confessions. At the hearing held on October 8, 2002, the trial court told the prosecutor and Gates' counsel, "I can show you something right now in these photographs that contradicts what was said on that confession."

limited the weight given by the jury to Hudgins' eyewitness identifications of Gates. See *United States v. Watson*, 792 F3d 1174, 1179 (1) (9th Cir. 2015) (even where defendant was identified by an eyewitness, "touch DNA could . . . be persuasive evidence" of defendant's innocence where it might indicate that someone other than the defendant pulled the clothing off of rape victim); *State v. Parmar*, 808 NW2d 623, 634 (3) (b) (Neb. 2012) ("[B]ecause the testimonies of the State's eyewitnesses were the key evidence against [defendant] at trial, DNA testing results that were probative of a factual situation contrary to the eyewitnesses' version of the facts and tended to create a reasonable doubt about [defendant's] guilt probably would have produced a substantially different result if the results had been available at trial."). Here, as with Gates' confessions, the record reflects a number of problems with Hudgins' identifications of Gates. As noted above, on cross-examination, Hudgins admitted that Gates was two to three years younger and four to five inches shorter than the person Hudgins described during his direct testimony regarding the man who came to his door.

Hudgins also testified that, of the four other people in the live police lineup besides Gates, one was "considerably taller" than Gates and one was "considerably heavier." Had the newly discovered DNA evidence been available to Gates at the time of his trial, it may well have further undermined the weight and credibility a reasonable juror would lend to these already problematic identifications.

The newly discovered DNA evidence might have also undermined the weight to be given to the fingerprint evidence linking Gates to the crime scene, particularly given that Gates posited an alternate explanation for the presence of such evidence. See *United States v. Fasano*, 577 F3d 572, 578 (III) (5th Cir. 2009) (even where conviction for robbery was "well supported by evidence," including eyewitness testimony and fingerprint evidence connecting defendant to the crime, defendant was entitled under the federal Innocence Protection Act to DNA testing of clothing and glasses worn by perpetrator because, if defendant's DNA was not found on such items, "the strength of the evidence by no means makes fanciful a conclusion that there is a reasonable probability that [the

defendant] was not the robber"). Here, the fingerprint evidence suffered from a number of weaknesses. Specifically, no fingerprints were found when police searched the apartment on the day of Wright's murder. It was only after Gates walked through the apartment two months later while giving his videotaped confession that his fingerprints were discovered. Moreover, when the technician arrived at the apartment, he was directed specifically to the apartment's heater and lifted fingerprints from the heater and no other location. The technician testified that it was rare for fingerprints to survive on a surface for more than two or three weeks. According to the technician, the fingerprint he removed from the heater had been placed there "recent[ly]" but more than "a matter of minutes or hours" before. The technician testified that the prints were of a high quality, which was unusual for prints that had allegedly been left two months prior. But he noted that he had been able to lift the prints because they had "crystallized" onto the surface of the heater, and speculated that this was because Gates had handled an oil can before touching the heater. He admitted,

however, that he had never seen this before. At trial, Gates' counsel suggested that Gates had performed an earlier unrecorded walk-through of the apartment with police and that Gates had been instructed by the police to touch the heater. On cross-examination, police detectives denied both allegations, undercutting Gates' suggestion that the fingerprints had been left on the heater some time after the day Wright was killed. However, had the newly discovered DNA evidence been available to Gates, he would have had a stronger basis for advancing this theory and for attacking the credibility of the detectives' testimony and the State's fingerprint evidence.

Thus, although the State presented strong evidence of Gates' guilt, Gates could have much more effectively countered such evidence had he also been able to present the newly discovered DNA evidence. In light of the weight given to such evidence by jurors, we cannot say that the trial court abused its discretion when it determined that the newly discovered evidence — the TrueAllele analysis of the DNA test results and the testimony supporting it —

is so material that it would probably produce a different verdict. See *Drane*, 291 Ga. at 303 (3) (a) (finding no abuse of lower court's discretion in ruling on materiality "[p]articularly in light of the discretion afforded to the trial court in its assessment of [the] new testimony . . . which the [lower] court observed live in the courtroom"). The trial court did not abuse its discretion when it determined that Gates satisfied each of the *Timberlake* factors with regard to such evidence. We therefore affirm the judgment of the trial court granting his motion on that basis.

## *Case No. S19X1131*

4. In light of our determination in Division 3 above that the trial court did not abuse its discretion in granting Gates a new trial on the basis of newly discovered DNA evidence, we need not address Gates' claim in his cross-appeal that the trial court should have granted him a new trial on the basis of his claim regarding racial discrimination in jury selection. Such claim is now moot.[22]

---

[22] We note that, following the entry of the trial court's order granting Gates' extraordinary motion for new trial and the filing of the parties' briefs

*Judgment affirmed. Melton, C. J., Nahmias, P. J., and Blackwell, Boggs, Peterson, Warren, and Ellington, JJ., concur.*

---

with this Court, we held that to the extent a defendant raises constitutional claims, such claims are not cognizable in an extraordinary motion for new trial and may be pursued only through a petition for a writ of habeas corpus. See *Mitchum v. State*, 306 Ga. 878, 887 (2) (834 SE2d 65) (2019). We note, however, that the record supports the trial court's very troubling findings regarding the selection of jurors in Gates' 1977 trial and the other capital murder trials held in the Chattahoochee Judicial Circuit between 1975 and 1979.

DECIDED MARCH 13, 2020.

Murder. Muscogee Superior Court. Before Judge Allen, Senior Judge.

*Julia F. Slater, District Attorney, Frederick Lewis, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Channell V. Singh, Assistant Attorney General*, for appellant.

*Patrick Mulvaney, Clare M. Gilbert, Katherine L. Moss*, for appellee.