**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: March 21, 2023

S23A0043.  NUNDRA v. THE STATE.

PETERSON, Presiding Justice.

Thaddas Nundra was convicted of murder and many other serious charges related to the shooting death of Herbert Moore.[1] On

---

[1] Three people were charged with the October 26, 2017, murder and robbery of Herbert Moore — Nundra, Ronnie McFadden, and Louis Ousley. McFadden was acquitted of all charges, except conspiracy to commit burglary. Ousley accepted a plea deal in exchange for testimony against Nundra. He pleaded guilty to conspiracy to commit armed robbery and conspiracy to commit burglary in exchange for a 20 year sentence.

On August 14, 2018, a Decatur County grand jury indicted Nundra for malice murder (Count 1), aggravated assault (Count 2), felony murder (Counts 3, 6, 8, 10, and 12), possession of a firearm during the commission of a felony (Count 4), conspiracy to commit burglary (Count 5), conspiracy to commit armed robbery (Count 7), criminal attempt to commit burglary (Count 9), criminal attempt to commit armed robbery (Count 11),  and possession of a firearm by a convicted felon (Count 13).

Nundra was found guilty on February 14, 2019, of Counts 1, 2, 3, 4, 8, 11, and 12, as well as a lesser included offense on Count 5. He was acquitted on counts 6, 7, 9, and 10. The State entered a nolle prosequi on Count 13, charging possession of a firearm by a convicted felon.

The trial court pronounced Nundra's sentence on February 14, 2019, and he filed a motion for new trial on February 26, 2019. Nundra's premature motion for new trial ripened when the trial court entered its sentence on

appeal, he asserts the trial court made four key errors, and he contends that the cumulative effect of those errors requires reversal.

We assume without deciding that the trial court made two errors. First, we assume that the trial court abused its discretion in admitting evidence of Nundra's 1997 convictions for armed robbery and hijacking a motor vehicle. And second, we assume that the trial court erred in admitting certain evidence of the victim's good character. We conclude, however, that these errors were harmless, both individually and cumulatively.

And we reject Nundra's remaining claims. The trial court did not abuse its discretion in allowing the State to compare Nundra to

---

February 27, 2019. See *Seals v. State*, 311 Ga. 739, 739 n.1 (860 SE2d 419) (2021); *Southall v. State*, 300 Ga. 462, 463-464 (1) (796 SE2d 261) (2017).

The trial court sentenced Nundra to life in prison without the possibility of parole for Count 1, a consecutive five-year term of imprisonment for Count 4, and a consecutive two-and-a-half year term of imprisonment for Count 5. The remaining counts merged or were vacated by operation of law.

Nundra amended his motion for new trial in December 2020, and the trial court denied it on February 28, 2022 following a hearing. Because he did not receive notice of the ruling, Nundra failed to file a timely notice of appeal. On Nundra's motion raising the lack of notice, the trial court vacated and re-entered the order on April 28, 2022. Nundra timely appealed. The case was docketed to this Court's term beginning in December 2022 and submitted for consideration on the briefs.

serial killers. Lawyers have wide latitude in closing arguments. And while these comments were certainly inflammatory, they were based on permissible inferences from evidence in the record. Nor has Nundra shown that it was plain error to allow the State to introduce "TrueAllele" DNA evidence without a baseline of how likely a sample was to match a random person. Nundra did not preserve this particular issue below, so our review is only for plain error (and not abuse of discretion). And he fails to show that admitting the evidence without his preferred explanatory baseline was plain error.

We therefore affirm Nundra's convictions.

1. (a) *The Crime*[2]

On the night of October 25, 2017, Nundra, Ronnie McFadden, and Louis Ousley were spending time at Na'Gina Hightower's apartment. Hightower was dating McFadden at the time, even though McFadden was married to someone else. They were there to

---

[2] "Because this case requires an assessment of the harmful effect of alleged trial court errors, we lay out the evidence in detail and not only in the light most favorable to the verdicts." *Allen v. State*, 310 Ga. 411, 412 n.2 (851 SE2d 541) (2020).

smoke "molly" with a large group of people. Around 4:00 a.m., Nundra, McFadden, and Ousley left.

The three men walked towards a pawn shop, planning to break into it. As they tried to figure out a way over the fence around the pawn shop, Nundra noticed a man in a truck in a parking lot across the street.

Watching the driver, Herbert Moore, park his vehicle, Nundra asked Ousley to hand over the gun he had brought. Nundra told McFadden and Ousley he was going to rob Moore, and he went and hid in the bushes behind the truck.

He then ran up to Moore and demanded he "[g]ive it up." Moore attempted to fight back, and Nundra fired eight shots, hitting Moore twice. Nundra, McFadden, and Ousley fled the scene.

(b) *The Aftermath*

Around 6:00 a.m., Hightower heard the shots ring out from her nearby apartment. Roughly 20 minutes later, McFadden and Ousley came running back into her apartment. They were in a near panic; McFadden collapsed on the floor, struggled for breath, and threw up.

4

Ousley stood nearby, crying and trying to catch his breath. Some 15 minutes after that, Nundra returned. He was not wearing the hat that he had worn during the shooting. Nundra asked for a change of clothing, borrowing a pair of jean shorts from Ousley. He also asked for bleach and a towel to clean his hands.

Nundra cleaned himself and cooked breakfast. He talked about the murder, and warned McFadden and Ousley he would kill them if they talked to the police. As Nundra prepared to leave Hightower's apartment, he said he was going to burn his clothes.

After dropping Hightower's son off at school, Nundra and McFadden went back to McFadden's home. There, they burned their clothing, and Nundra changed clothes a second time. McFadden's wife saw them burning something, and said that Nundra needed to leave.

(c) *The Investigation*

When police arrived on the scene of the shooting, they found six cartridge casings by the back left tire of the truck. There were

bullet holes in the windshield, the door, the seat, the victim's body, and the roof of the truck.

The investigators then canvassed the nearby streets. They initially learned of two suspects: Nundra and McFadden. They also learned that Nundra was driving a white Dodge truck. Nundra later gave police consent to search his truck. There was nothing in the truck specifically implicating Nundra in the shooting, though he did appear to have packed the vehicle as though he were leaving town.

Sometime later, a city employee contacted investigators about a black puffy jacket discovered in the wooded area of a nearby park.[3] They then went to search the park, where they found a gun wrapped in a stocking hat — partially buried near the place where the black jacket had been found.

After that, the police detained McFadden and Ousley, and arrested Nundra in connection with the murder. Nundra admitted that he was in the area with McFadden and Ousley, but he claimed

---

[3] The jacket was sent to the GBI crime lab, but apparently never submitted for testing.

that he was at the post office and did not know anything about the murder.

Later on, the gun and the stocking hat were sent for forensic testing. The GBI determined that the bullets and casings collected at the crime scene all came from the gun. And a DNA specialist found a match of DNA profiles between Nundra and a sample taken from the hat.

(d) *The Trial*

Four aspects of the trial are relevant to this appeal.

i) First, the State introduced, over Nundra's objection, evidence of Nundra's 1997 convictions for armed robbery and hijacking a motor vehicle. That evidence showed the following. On a Sunday night in December 1996, a man named Rufus Walker was driving his car, and he made contact with Nundra. Nundra pulled a gun and shot him multiple times — including once in the left eye, which Walker lost. Nundra also beat Walker with the pistol, robbed him, and stole his car.

Before this evidence was presented to the jury, the trial court

instructed the jury that there were limited purposes for which the evidence could be considered under OCGA § 24-4-404 (b) ("Rule 404 (b)"). The court did not adequately specify for which of the Rule 404 (b) purposes the jury could consider the evidence, instead stating generally that

> in order to prove its case as alleged in the indictment, the State must [show] knowledge, intent, participation — conspiracy, plan, preparation, and it may show motive or opportunity. To do so the State intends to offer evidence of other acts allegedly committed by an accused. You're permitted to consider that evidence only insofar as it may relate to those issues and not for any other purpose. You may not infer from such evidence that the accused is of a character that would commit such crimes.

The trial court repeated essentially the same admonition in its final jury instructions. This time, the court added

> [a]gain, such evidence . . . may not be considered by you for any other purpose. The accused is on trial for the offenses charged in the bill of indictment only and not for any other acts[,] even though such acts may incidentally be criminal and may have resulted in conviction. Before you may consider any [such] acts for the limited purposes stated earlier, you must first determine whether it's more likely than not that the accused committed the other alleged acts. If so, you then must determine whether the acts shed any light on the elements of the offense for which the act has been admitted in the crimes charged in the indictment . . . . Remember to keep in mind the limited use and prohibited

8

use of this evidence about . . . other acts of the accused.

The State talked about these convictions during closing arguments: "Mr. Nundra intimidates people based on fear. He likes to bully people. Likes to pick on people when they're vulnerable. In the '90s when Mr. Rufus Walker is in a vehicle, he goes up to him, Mr. Walker can't see him, shoots him in the eye. When Mr. Moore is trying to get in his work truck, sneaks up behind him from the bushes with a gun and shoots him. Because he's a bully."

ii) Second, various pieces of evidence came in tending to show the good character of the victim and evoke sympathy for him, his widow, and the community. Donald Grubbs, who heard the gunshots from his home and had his wife call the police, discussed his relationship with Moore and described him as the "nicest fellow." Along the same lines, a police captain who responded to the scene said that he had known Moore for "20-something years" and was sad while he gave the victim chest compressions. And, most importantly, the State elicited more of this sort of evidence from Moore's widow. In response to a question about why Moore had not retired, she

testified that Moore had been planning on retiring but wanted to take care of her, and make sure she was eligible for Medicare before he stopped working. The State also introduced a picture of the two of them together (to which Nundra objected under Rule 403). And, asked about cows shown in that photo, Moore's widow testified that she had been forced to sell their cows because she couldn't take care of them by herself. The State also referred back to all of this evidence in closing arguments.

iii) Third, and again during closing arguments, the State compared Nundra to serial killers Jeffrey Dahmer, Charles Manson, and Ted Bundy, calling Nundra a "sociopath."

iv) Finally, Nundra objected to the introduction of DNA evidence analyzed through TrueAllele software. The stocking hat contained the DNA profiles of at least four individuals, testified Emily Mathis, a forensic biologist for the GBI, and so the GBI used TrueAllele to analyze those samples. Explaining the scientific value of the TrueAllele software, Mathis testified that it "uses very high level mathematics and algorithms in order to interpret [the] data

and do so without any bias." In essence, she testified, the software compares "reference samples from [known] individuals to . . . evidence samples." The software then assigns statistical weight to the likelihood of a match between the reference sample and the evidence sample. Mathis testified that the results here showed "it was approximately two billion times more probable that the evidence matched Thaddas Nundra" than "a random individual in the population." Thus, Mathis concluded that Nundra's DNA was, indeed, on the hat.

2. Nundra first argues that the trial court abused its discretion in admitting evidence of Nundra's 1997 convictions under Rule 404 (b). We need not decide whether he is correct, because even if this was error, it was harmless given the strength of the other evidence against Nundra, the trial court's instruction that the jury could not use the evidence to conclude Nundra had a propensity to commit these sort of crimes, and the fact that the jury was told Nundra had been charged and pleaded guilty for the crimes.

A trial court's evidentiary error "requires reversal of [the

a]ppellant's convictions unless it can be deemed harmless, meaning that 'it is highly probable that the error did not contribute to the verdict.'" *Heard v. State*, 309 Ga. 76, 90 (3) (g) (844 SE2d 791) (2020) (quoting *Brown v. State*, 303 Ga. 158, 164 (2) (810 SE2d 145) (2018)). "In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done[.]" *Jackson v. State,* 306 Ga. 69, 80 (2) (c) (829 SE2d 142) (2019) (citation and punctuation omitted).

Generally, we have found Rule 404 (b) errors harmless "where the properly admitted evidence . . . was so strong that the prejudicial effect of the other-acts evidence had no significant influence on the guilty verdicts." *Heard*, 309 Ga. at 91 (3) (g) (collecting cases); see also *Thompson v. State*, 302 Ga. 533, 542 (III) (A) (807 SE2d 899) (2017) ("Where evidentiary error is deemed harmless, it is often true that the evidence was only 'marginal' to the prosecution's case.") (quoting *Johnson v. State*, 301 Ga. 277, 280 (2) (800 SE2d 545) (2017)).

And so it is here. Evidence of previous violent crimes like the

1997 convictions certainly could have a substantial prejudicial effect. See *Strong v. State,* 309 Ga. 295, 316 (4) (845 SE2d 653) (2020) (noting "the severity of the prior acts and their resulting injuries"); *Kirby v. State*, 304 Ga. 472, 486 (4) (a) (ii) (819 SE2d 468) (2018) (other-acts evidence "had some prejudicial force, because it suggested that Appellant was not only an armed robber, but a serial armed robber — and indeed a violent criminal who kept committing dangerous crimes[.]") But given the other evidence against Nundra, the fact that the jury was told that Nundra had pleaded guilty to criminal charges arising from the other acts (meaning it could infer he had been punished for those crimes), and the trial court's limiting instruction, we conclude that it is highly probable that any such prejudice did not contribute to the jury's verdict.

First and foremost, the evidence of Nundra's guilt was very strong. Ousley testified that Nundra participated in planning a burglary, and then used Ousley's gun to attempt to rob Moore — but ended up killing him instead. Ousley also testified that a jacket recovered in a nearby park was the same one Nundra had been

13

wearing on the morning of the murder. Consistent with Ousley's account, substantial physical evidence implicated Nundra, including the murder weapon, found wrapped in a stocking cap in the same area of the park as the jacket, and containing Nundra's DNA. And Nundra's behavior after the fact suggested a consciousness of guilt. Hightower testified that Ousley and McFadden came "running through the back door" 15 to 20 minutes after she heard the gunshots, with McFadden crying and throwing up; Nundra arrived a few minutes after them, at which point, according to Ousley, Nundra was no longer wearing his hat. The jury could easily have inferred from this testimony that Nundra had discarded the hat and jacket he had been wearing — which accounted for why he arrived at Hightower's apartment later than McFadden and Ousley.  Once there, he asked Hightower for bleach, he told Ousley he planned to burn the remaining clothes he had been wearing, and he was later seen by McFadden's wife burning something with McFadden behind their house. Finally, Nundra told McFadden and Ousley he planned to leave the state, and he threatened to kill them if they talked to

14

the police. In short, the properly admitted evidence of Nundra's guilt was very strong — which significantly reduces the likelihood that the jury convicted him for his past conduct rather than the conduct charged in this case. See *Jackson,* 306 Ga. at 81 (2) (c).

Second, the evidence also made clear that Nundra had committed the prior crime a long time ago, and that he had pleaded guilty. And although it does not appear the jury was ever told what *sentence* Nundra received for his crimes, the knowledge of his guilty plea nonetheless reduces the risk that the jury convicted Nundra to punish him for his other crimes, because the jury could infer that Nundra had already been punished for those crimes.[4] Compare

---

[4] During the pretrial hearing on Nundra's motion to suppress, the State represented that Nundra had served 20 years in prison following the 1997 convictions and was released in November of 2016. That information was not presented to the jury at trial or included in the court record that was introduced into evidence. But the jury *was* told that the crimes occurred in 1996, and that Nundra pleaded guilty in 1997, so the prior crimes and the ones charged here were not so close in time that time alone would lead the jury to infer that Nundra received little or no punishment. Cf. *Thomas v. State,* 314 Ga. 681, 685 (1) (a) n.2 (878 SE2d 493) (2022) (when previous crime was committed only four years and four months before crime at issue, "the jury necessarily knew that [defendant] could not have spent much more than four years in custody for the shooting of [prior victim], a sentence the jury may have viewed as inadequate for such a violent offense").

*Strong,* 309 Ga. at 316 (4) (viewing the prejudice of admitting prior crimes especially high because of "the absence of evidence that [the defendant] was ever punished in any way for [his] many serious crimes"), and *United States v. Beechum*, 582 F2d 898, 914 (5th Cir. 1978) (noting that the danger that the jury may convict the defendant due to an uncharged offense "is particularly great where . . . the extrinsic activity was not the subject of a conviction; the jury may feel that the defendant should be punished for that activity even if he is not guilty of the offense charged"), with *Jones v. State,* 311 Ga. 455, 465 (3) (b) (ii) (858 SE2d 462) (2021) (weighing probative value versus prejudice under Rule 404 (b), and concluding that "the jury learned that [the defendant] had already admitted his guilt and was convicted and sentenced to eight years in prison for attacking [the victim], making it less likely that the jury would want to punish him for the other-acts rather than for the charged crimes"), and *Kirby,* 304 Ga. at 485 (4) (a) (i) (noting that "the jury learned that [the defendant] had already admitted his guilt and been convicted and served a prison sentence for his 1990 conduct, making

16

it less likely that the jury would want to punish [him] for this past conduct rather than the charged crimes").

Third, although the trial court's limiting instructions did not meaningfully explain for which permissible purpose the evidence was relevant, they did, at least, tell the jury what it could *not* do: "You may not infer from such evidence that the accused is of a character that would commit such crimes." And we have held that this sort of admonition can lower the risk that the jury will convict for the wrong reasons. See *Morrell v. State,* 313 Ga. 247, 262 (2) (c) (869 SE2d 447) (2022); see also *Jackson,* 306 Ga. at 82 (3) (although the trial court's initial limiting instruction about a prior crime was "obviously incomplete," "this Court considers the instructions as a whole" (citation and punctuation omitted)). To be clear: because these instructions did not sufficiently specify the permissible purposes for which the evidence could be considered, they do not have the same mitigating effect that we have found in other cases where the trial judge specifically instructed the jury on which Rule 404 (b) purposes could be considered. Even so, the trial court's

17

admonition that the jury "may not infer from such evidence that the accused is of a character that would commit such crimes" reduces the likelihood that the evidence of Nundra's past crimes influenced the verdict.

Thus, because the evidence of Nundra's guilt was very strong, because Nundra's guilty plea allowed the jury to infer that he had been punished for his prior crimes, and because the trial court instructed the jury not to consider the evidence as proof of Nundra's propensity to commit these sort of crimes, we conclude it was highly probable that admitting the 1997 convictions did not contribute to the verdict.

3. Nundra next argues that the trial court should not have allowed the State to introduce evidence of the victim's good character and talk about it during closing arguments. We assume without deciding that the evidence should not have been admitted. But we conclude, because the evidence of Nundra's guilt was very strong, that this was harmless.

(a) "Generally, apart from evidence of a 'pertinent trait,'

character of the victim is irrelevant because it is just as unlawful to commit a crime against a person of bad character as it is to commit a crime against a person of good character." Agnor's Georgia Evidence § 6:10 (November 2022 Update) (citing *Walker v. State*, 312 Ga. 232, 238 (3) (862 SE2d 285) (2021); *Maynor v. State*, 241 Ga. 315, 316 (245 SE2d 268) (1978)); see also OCGA § 24-4-404 (a), OCGA § 24-4-405 (a)-(b); *Timmons v. State*, 302 Ga. 464, 468 (2) (a) (807 SE2d 363) (2017). Thus, "evidence about a crime victim's personal characteristics and the emotional impact of the crime on the victim, the victim's family, and the victim's community generally is not admissible in the guilt[ or] innocence phase of a criminal trial." *Lofton v. State*, 309 Ga. 349, 363 (6) (b) (ii) (846 SE2d 57) (2020).

Nundra points to three instances of supposed good-character evidence. First, he complains that Grubbs was allowed to discuss his relationship with Moore and describe him as the "nicest fellow." Second, he objects that the first officer on the scene was permitted to say that he had known Moore for "20-something years" and was sad while he gave the victim chest compressions. And third, and

perhaps most importantly, he points out that the State elicited more of this sort of evidence from Moore's widow. In response to a question about why Moore had not retired, for example, she testified that Moore had been planning on retiring but wanted to take care of her and make sure she was eligible for Medicare before he stopped working. The State also introduced a picture of the two of them together, and, asked about cows shown in that photo, Moore's widow testified that she had been forced to sell their cows because she couldn't take care of them by herself.

And, as discussed, the State referred back to all this in closing arguments, apparently in an effort to evoke sympathy for Moore and his widow. Speaking of the impact on the community, the State told the jury that Grubbs and his son "knew Mr. Moore. Nice guy. Played with their dogs. Talked to everybody around here." Plus, the State told the jury, the officer who testified about knowing Moore "is not the most flowery, smiley guy that we have on our police force. And the fact that he was [choked] up, almost crying, about Mr. Moore tells you a lot about how this has impacted [the] community." On the

20

impact to Moore's wife, the State reminded the jury that she "had to sell the cows that he kept," and emphasized that the couple had been "married almost 26 years . . . . He would go to work, come home, have lunch with his wife, [and] play with his dog. Had a simple life. Raised cows. Loved each other." Referencing the fact that his closing argument was given on Valentine's Day, the State noted that Moore's widow would not receive flowers from him anymore. And on Moore's own good character, the State pointed out that "[h]e kept working for 32 years so that his wife could get Medicare."

(b) Assuming that Nundra preserved this issue for ordinary appellate review, and that admitting the evidence was error, the State would still have the opportunity to show that it is "highly probable that the error did not contribute to the verdict." *Smith v. State,* 299 Ga. 424, 432 (2) (d) (788 SE2d 433) (2016) (citation and punctuation omitted).

And once again we conclude that that this evidence did not affect the outcome of the trial. For the reasons already discussed, the evidence of Nundra's guilt was very strong, so the risk that

evidence of the victim's good character would lead the jury to convict Nundra for some reason other than guilt was fairly low. See *Lucas v. State,* 274 Ga. 640, 642-644 (2) (555 SE2d 440) (2001) (concluding that "certain comments . . . and testimony" that "improperly raised the worth of the victims and the impact wrought by their deaths" were harmless in the light of the defendant's confessions of guilt to a friend and law enforcement officers, as well as corroborating evidence of the crime). Thus, this claim fails as well.

4. Next, and relatedly, Nundra contends that the trial court abused its discretion in allowing the State to compare him to "sociopaths" and serial killers like Jeffrey Dahmer, Charles Manson, and Ted Bundy. On this point, we disagree. The State's comments here were inflammatory, but attorneys are allowed wide latitude in their arguments to the jury. And these arguments drew on permissible inferences from the evidence, and did not (as Nundra suggests) rely on facts or diagnoses not in evidence. That is enough to reject Nundra's claim.

(a) During closing arguments, the State told the jury that "Mr.

Nundra is very similar to Jeffrey Dahmer, Charles Manson, and Ted Bundy. All four of them are sociopaths." Nundra objected that this was "wholly inappropriate"; that "no doctor [ ] came in and said that Mr. Nundra has sociopathic qualities," so the characterization was "not in evidence." But the trial court overruled the objection, and the State doubled down, insisting that "Mr. Nundra is a sociopath. Anyone [who,] after they kill a man acts like it's no big deal, anyone that goes to someone's house and makes eggs and grits after they shot a man . . . is a sociopath . . . . He is sick."

Nundra argues on appeal that allowing the State to refer to him as a sociopath was "inflammatory, not supported by the evidence, irrelevant, and an improper appeal to passion or prejudice" — and had "no relevant purpose for argument beyond inflaming the passion of the jury to convict regardless of whether the evidence proved Nundra was guilty beyond a reasonable doubt."

(b) OCGA § 17-8-75 addresses precisely this point:

Where counsel in the hearing of the jury make statements of prejudicial matters which are not in evidence, it is the duty of the court to interpose and prevent the same. On

23

> objection made, the court shall also rebuke the counsel and by all needful and proper instructions to the jury endeavor to remove the improper impression from their minds; or, in his discretion, he may order a mistrial if the prosecuting attorney is the offender.

Referencing famous crimes or criminals to make a point is not prohibited, but the remarks must be based on a "permissible inference from the evidence." *Robinson v. State*, 257 Ga. 194, 196 (4) (357 SE2d 74) (1987). We have said that "[c]ounsel may bring to his use in the discussion of the case well-established historical facts," and "may forcibly or even extravagantly attempt to impress upon the jury the enormity of the offense and the solemnity of their duty[.]" *Conner v. State*, 251 Ga. 113, 122-123 (6) (303 SE2d 266) (1983) (citations and punctuation omitted). And, just as importantly, "[a] closing argument is to be judged in the context in which it is made." *Booth v. State*, 301 Ga. 678, 686 (4) (804 SE2d 104) (2017).

So, for example, in *Robinson*, we held that the trial court was not required to declare a mistrial or give a curative instruction when, in closing arguments, "the prosecutor said that the [defendant] lied and" compared him to Charles Manson and Jim

Jones in terms of "their powers of persuasion and ability to control others." 257 Ga. at 196 (4). The accusation that the defendant lied was a "permissible inference from the evidence"; the defendant had filed a missing report on the victim, despite "evidence that he knew where she was." Id.; see also *Martin v. State*, 223 Ga. 649, 650-651 (2) (157 SE2d 458) (1967) (the prosecutor's comment that "the possibility of [the defendant] someday returning to society would be a greater damage than the threat of world communism and the Viet Cong . . . was a permissible inference from the evidence" because the evidence in the case involved "a brutal slaying"). And the comparisons to cultists like Manson and Jones were argumentative illustrations "of the ability of some people to exert control over others," and thus "within the wide latitude which we allow in closing arguments." *Robinson*, 257 Ga. at 196 (4); see also *Hudson v. State*, 273 Ga. 124, 127 (5) (538 SE2d 751) (2000) (identifying no error where "[t]he prosecutor compared [the defendant] to well-known murderers Charles Manson, David Berkowitz, and Jeffrey Dahmer, noting that they too contended they were not guilty by reason of

insanity and were delusional, but were nonetheless held accountable for their actions and found guilty of their crimes" because "[i]t is permissible to use well known cases to illustrate a legal principle"); *Pace v. State*, 271 Ga. 829, 843 (32) (b) (524 SE2d 490) (1999) ("The prosecutor compared Pace to serial killers like Bundy and Dahmer when arguing that the families of these serial killers would have also said nice things about them when they were children. Under these circumstances, this is not an improper argument.").

Conversely, we have held that it is error to allow these sort of arguments where the State's comments "inject[ ] into the argument [ ] extrinsic and prejudicial matters which have no basis in the evidence." *Bell v. State*, 263 Ga. 776, 777 (439 SE2d 480) (1994) (quoting *Conner*, 251 Ga. at 123 (6)). In *Bell*, for example, the defendant was merely charged with selling drugs — "there was no evidence of drug-related murder or serial rape," to which the State had compared Bell's actions, "[n]or evidence from which serial rape and murder would have been a reasonable inference." Id. Thus, we said, "[b]y referring to such extraneous and prejudicially

26

inflammatory material in her closing argument, the prosecutor exceeded the wide latitude of closing argument," and the trial court should have granted a mistrial. Id. at 778; see also *Conner*, 251 Ga. at 123 (6) ("The portion of the prosecutor's argument referring to his prior criminal experience and the frequency with which he had sought the death penalty was not supported by any evidence and, moreover, was not relevant to any issue in the case. The argument was therefore improper").

(c) Here, the State's arguments were inflammatory, but the trial court did not abuse its discretion in declining to take any corrective action. In context, the state's remarks about Nundra did not invoke medical facts or diagnoses not in evidence. To the contrary, the State's commentary illustrated the severity of the crime, the culpability of the conduct, and the stakes of the case — based on facts that were in evidence. The trial court was therefore not required to reprimand the State or give a curative instruction, let alone declare a mistrial. See *Robinson*, 257 Ga. at 196 (4).

5. Moving into evidence of the crime itself, Nundra asserts that

the trial court erred in allowing the State to introduce incriminating DNA evidence using TrueAllele software, insisting that there was not enough evidence to show that the software is sufficiently reliable. In particular, Nundra argues, the State's expert testified only that it was "two billion times more likely" that DNA on the cap recovered near the crime scene matched Nundra than a random individual — without explaining the probability that the sample would match a random person. The State responds that Nundra never objected to the expert's probability testimony, "nor did he object to the TrueAllele program or its results on the basis he now contests[.]" Thus, the State says, the issue can be reviewed only for plain error, and Nundra cannot show error because the likelihood a sample would match any random person goes to the weight of the evidence, not its admissibility. We agree.

(a) We begin by rejecting Nundra's assertion that he preserved this issue for ordinary appellate review. True, Nundra "objected to the TrueAllele evidence in a brief to the trial court following the pretrial hearing," but he did not so much as mention the

admissibility issue he advances here. Instead, he argued only that the State had failed to show "the tester substantially performed the [relevant] scientific procedures in an acceptable manner," on three fronts: (1) that "[the expert] admitted that the positive control test failed on the first DNA sample so a second sample was retrieved from the test tube and re-amplified"; (2) that, despite the State's "contention that TrueAllele is a better computing system [for analyzing DNA evidence] because it is unbiased and not subject to human error as it can eliminate choice," the software's creator and the expert witness both "admitted that humans do in fact play . . . an important role . . . in determining the number of contributors in a given DNA sample"; and (3) that "duplicate, concordant results were *never* achieved in this case." At trial, he reiterated that objection: "Judge, I don't have any objection to [the GBI forensic biologist] being tendered as an expert. However, at this time I would renew my previous objection that I had made about the admissibility of the evidence for the record."

That is not the same issue Nundra raises here. Nundra's

arguments below asserted a failure to show that the tester performed the procedures in an acceptable manner. His argument here, by contrast, is not that the test was not shown to have been performed correctly — but that the State or the expert should have been required to provide another piece of foundational information to the jury. Those are two different issues. Thus, because Nundra "did not raise these specific objections in the trial court below, his claim may be reviewed only for plain error." *Morton v. State*, 306 Ga. 492, 497 (3) (831 SE2d 740) (2019) (citing *Gates v. State*, 298 Ga. 324, 326-327 (3) (781 SE2d 772) (2016)).

(b) Nundra has not shown plain error. Under plain error review, we can reverse only if the trial court made a clear or obvious error that was not affirmatively waived, likely affected the outcome of the proceedings, and seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Gates*, 298 Ga. at 327 (3); *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011) ("As summarized even more succinctly in the context of OCGA § 17-8-58 (b), the proper inquiry is whether the instruction was erroneous,

whether it was obviously so, and whether it likely affected the outcome of the proceedings." (citation and punctuation omitted)). "Satisfying all four prongs of this standard is difficult, as it should be." *Kelly,* 290 Ga. at 33 (2) (a) (cleaned up). Nundra's argument is essentially that, because the State did not establish how likely it is that TrueAllele would identify a match between the DNA sample from the hat and DNA from a random member of the public, the testimony showing that the sample was two billion times more likely to be Nundra's DNA "[was] incomplete." "[T]wo billion times more likely than *what number*?" Nundra asks. Lacking that, he concludes, "[t]he statistics here were misleading and did not provide the jury with any context with which to evaluate the information." But whatever the merits of the argument, it fails to show that admitting the evidence was a "clear or obvious" error.

At the time Nundra was tried, former OCGA § 24-7-707 (2013), governing expert testimony, was still in effect. Under that rule, "the opinions of experts on any question of science, skill, trade, or like questions [were] always [ ] admissible" in criminal cases, "and such

31

opinions [could] be given on the facts as proved by other witnesses."
Id. "But trial courts still were empowered to exclude expert testimony based on a particular 'procedure or technique' on the ground that it had not 'reached a scientific stage of verifiable certainty.'" *Smith v. State,* 315 Ga. 287, 300 (2) (a) n.6 (882 SE2d 300) (2022) (quoting *Harper v. State,* 249 Ga. 519, 525 (1) (292 SE2d 389) (1982). "The trial court [could] make this determination from evidence presented to it at trial by the parties," or else "base its determination on exhibits, treatises[,] or the rationale of cases in other jurisdictions." *Harper,* 249 Ga. at 525 (1); see also *Walsh v. State,* 303 Ga. 276, 279 (811 SE2d 353) (2018) ("[t]he foundation for evidence based on a scientific principle or technique requires two findings regarding the evidence's reliability: . . . (1) the general scientific principles and techniques involved are valid and capable of producing reliable results, and (2) the person performing the test substantially performed the scientific procedures in an acceptable manner." (citation and punctuation omitted)). And, of course, whether to admit or exclude evidence was a matter within the trial

court's discretion. See *Kilpatrick v. State,* 308 Ga. 194, 196-197 (2) (839 SE2d 551) (2020).[5]

Nundra cites no authority — and we are aware of none — suggesting that expert testimony about a random-bystander benchmark is necessary for a trial court to admit TrueAllele evidence. The cases he cites to that end are inapposite.[6] Indeed, we

[5] We note for the bench and bar that "[t]he General Assembly recently has amended the Evidence Code . . . to extend to criminal cases the federal standard of admissibility of expert testimony articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (113 SCt 2786, 125 LE2d 469) (1993), and its progeny. See 2022 Ga. Laws, p. 201, § 1 (amending OCGA § 24-7-702). Under that standard, a trial court must evaluate the reliability of the expert's proffered testimony; proper considerations include 'whether a theory or technique can be tested, whether it has been subjected to peer review and publication, the known or potential rate of error for the theory or technique, the general degree of acceptance in the relevant scientific or professional community, and the expert's range of experience and training.'" *Smith v. State*, 315 Ga. 287, 300 (2) (a) n.6 (882 SE2d 300) (2022) (quoting *HNTB Georgia, Inc. v. Hamilton-King*, 287 Ga. 641, 642 (1) (697 SE2d 770) (2010)). Thus, the *Harper* standard does not apply to cases tried after July 1, 2022. See 2022 Ga. Laws, p. 201, 202 § 3.

[6] Nundra cites to one case involving field sobriety tests and another generally involving statistics. See *Duncan v. State*, 305 Ga. App. 268, 272 (2) (a) (699 SE2d 341) (2010) (cited for the proposition that courts have considered whether a witness was sufficiently trained and experienced to give the Horizontal Gaze Nystagmus test and interpret its results); *Caldwell v. State*, 260 Ga. 278, 289-290 (1) (e) (393 SE2d 436) (1990) (cited because it "discuss[ed] problems with determination the relevant population and its importance to statistics.")

have discussed TrueAllele in detail just once, in *Gates v. State*, 308 Ga. 238 (840 SE2d 437) (2020).[7] And all we said there was that (1) the defendant had shown reasonable diligence in filing his extraordinary motion for a new trial based on TrueAllele analysis, and (2) the DNA evidence offered in that case was material and may well affect the outcome of the case. Id. at 250 (3). We had no reason to consider any challenge to the admissibility of the evidence, because "[t]he State did not contest the accuracy of the TrueAllele results . . . and its witnesses testified that TrueAllele is 'scientifically valid[.]'" Id. at 251 (3).Thus, it is not clear or obvious that the baseline Nundra suggests is required, and so he has failed to show that the decision to admit the TrueAllele analysis was plain error.

6. Finally, we reject Nundra's argument that the cumulative effect of errors below requires reversal.

When this Court has identified or presumed more than one error, although the effect of each on its own might have been

---

[7] We also discussed *Gates* and TrueAllele in *Smith,* but only to say that expert opinion *is* evidence — not for any issues related to the admissibility of TrueAllele analysis itself. See *Smith*, 315 Ga. at 296-297 (2) (a).

34

harmless to the defendant's trial, we have looked to whether the combined effect of the errors harmed the defendant. See *State v. Lane*, 308 Ga. 10, 13-14 (1) (838 SE2d 808) (2020). We "consider collectively," rather than individually, "the prejudicial effect, if any, of trial court errors[.]" Id. at 17 (1).

It is "highly probable that the error" in admitting Nundra's 1997 convictions and the good character evidence of the victim "did not contribute to the verdict." *Allen v. State*, 310 Ga. 411, 418 (4) n.6 (851 SE2d 541) (2020) (citations and punctuation omitted). Although the 1997 convictions for a violent crime held the potential for prejudice, and the good character evidence invited sympathy for the victim and his widow, the jury was charged that it was not permitted to be influenced by sympathy for either party. We typically presume juries follow the instructions that they are given by the trial court, absent evidence to the contrary. See *Ash v. State*, 312 Ga. 771, 781 (2) (865 SE2d 150) (2021); see also *Lofton v. State*, 309 Ga. 349, 367 (7) (846 SE2d 57) (2020) (relying on jury instruction not to show sympathy in concluding that the combined prejudicial effect of

various actual and assumed errors and deficiencies by counsel, including counsel's failure to object to the State's improper victim impact arguments, was not sufficient to outweigh the strength of the properly admitted evidence of the appellant's guilt). And, on the other side of the ledger, there was very strong, independent evidence of Nundra's guilt. See *Payne v. State,* 314 Ga. 322, 334 (4) (877 SE2d 202) (2022) (concluding prejudice from presumed error and presumed deficiencies of counsel was insufficient to reverse where "[t]he jury heard a significant amount of incriminating testimony" unrelated to the presumed errors). "Given this strong evidence," which Nundra "fails to undermine on appeal, it is highly unlikely that the jury here was swayed by other acts evidence" and the good character of the victim. *Allen,* 310 Ga. at 418 (4). We therefore conclude that "[i]t is not at all probable that the collective effect of the assumed errors" harmed Nundra. Id.

*Judgment affirmed. All the Justices concur.*