**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: May 13, 2025

S25A0299. MCIVER v. THE STATE.

ELLINGTON, Justice.

Benjamin Clarence McIver appeals his convictions for malice murder and other crimes in connection with the shooting death of Brandon Smith.[1] McIver contends that his trial counsel provided

---

[1] The crimes occurred on April 16, 2020. After being originally indicted on December 2, 2020, McIver, Antavius Teazia Wilcox, and James Alphonso Parker were reindicted by a Chatham County grand jury on March 25, 2021. McIver and Wilcox were charged with malice murder, three counts of felony murder, and one count each of armed robbery, kidnapping, aggravated assault, and possession of a firearm during the commission of a felony. McIver alone was charged with possession of a firearm by a convicted felon, but that count was nolle prossed after trial. Wilcox alone was charged with possession of a firearm by a first-offender probationer. Parker alone was charged with the offense of tampering with evidence. McIver was tried separately at a jury trial that ended on June 30, 2022, and he was found guilty on all counts. On July 1, 2022, McIver was sentenced to serve three consecutive terms of life in prison without the possibility of parole for malice murder, armed robbery, and kidnapping, and a consecutive five-year prison term for possession of a firearm during the commission of a felony. More specifically, the armed robbery sentence was run consecutively to malice murder, the kidnapping sentence was run consecutively to armed robbery, and the sentence on the firearms count was run consecutively to kidnapping. The felony murder counts were vacated

constitutionally ineffective assistance, that the trial court committed plain error by not suppressing part of a custodial statement, and that the evidence was insufficient to sustain the jury's verdict as to armed robbery. For the reasons explained below, we reverse McIver's conviction for armed robbery but affirm his remaining convictions, and we remand the case to the trial court for resentencing.

The evidence presented at trial showed that, on April 16, 2020, McIver and co-indictee Antavius Wilcox, who was not tried with McIver, bound Smith with computer cords, kidnapped him in his vehicle, took and used his debit card, and executed him in a wooded area past the end of Pate Street, a dead-end street in Chatham County. Much of the evidence, as summarized below, came from forensic extractions and records relating to cell phones belonging to

by operation of law, and the aggravated assault count was merged into the armed robbery. McIver filed a timely motion for new trial, which he amended through new counsel on January 18, 2023. After hearings on February 7 and October 24, 2023, the trial court denied McIver's amended motion for new trial on August 12, 2024. McIver filed a timely notice of appeal, and the case was docketed in this Court to the term beginning in December 2024 and submitted for a decision on the briefs.

Smith, Wilcox, and McIver, which revealed their movements and communications on the day of the shooting. Such evidence showed that Wilcox arranged to meet Smith and for the two of them to meet McIver, that soon afterwards Wilcox used Smith's debit card, and that Wilcox then worked to obtain a gun.

On the morning of April 16, Smith was working for a plumbing and mechanical company when he was instructed between 9:30 and 10:00 a.m. to go to a different job site, and he left in his gray Kia Optima. Smith communicated with Wilcox first through a dating app and then directly by cell phone. There were several calls between their phones from 10:22 a.m. to 11:20 a.m.[2] At 11:08 a.m., Smith's phone was used to locate an apartment complex near Wilcox's residence, where Wilcox's phone was simultaneously located, and Smith's phone moved to the same complex. Smith's phone then searched for an address that was near the residence of James Parker, who lived with Remon Roberson, although there was

---

[2] The evidence showed that those calls may have been deleted later from Smith's phone.

no evidence that Smith had any connection with the area. Wilcox, Roberson, and Parker were members of the Blood gang. That morning, Wilcox was attempting to locate Parker to obtain a firearm that she had previously loaned to him, but she was unable to locate him at that time.

Cell phone data also showed that Wilcox spoke with McIver at least seven times between 8:40 a.m. and 11:52 a.m., with a few of their calls lasting longer than ten minutes. At 11:29 a.m., McIver texted Wilcox "Savannah Gardens off Pennsylvania Avenue" and then "Kall when you in route so I can B050." At McIver's trial, the State's gang expert testified that Blood gang members often substitute the letter "c" with the letter "k" in words and that "B050" was a term used by Blood gang members meaning to "be on point" or "be ready." At 11:37 a.m., Wilcox texted McIver "GK, you got knife," and McIver responded "red," which the gang expert testified is Blood slang for "Respect Every Damu," the last word of which is Swahili for "blood." At 11:44 a.m., Smith's phone was used to search for Capital Street, which is near Savannah Gardens, and Wilcox's

4

phone moved to that location at the same time McIver's phone was there. After a text from McIver to Wilcox at 12:00 p.m., McIver's phone had no activity for almost three hours, which indicated that the phone was off during that period or the data was deleted. There was never any communication between Smith's phone and McIver's phone.

At 12:09 p.m., Smith's phone searched for Wells Fargo and traveled to a Wells Fargo Bank branch, arriving at 12:18 p.m. In surveillance footage, Wilcox, who was wearing a head wrap and mirrored sunglasses and was driving Smith's vehicle, obtained money using his debit card while someone in the passenger seat was covering his face with a white cloth. Between 12:50 p.m. and 1:37 p.m., several calls were made from both Wilcox's and Smith's phones to Parker and Roberson. Roberson testified that Wilcox had been calling Roberson to ask where Parker was and that she asked if she could get Roberson's gun, but Roberson did not want to give it to her. Roberson eventually told Parker to respond to Wilcox and give Wilcox her gun or "whatever she want[ed]." Parker eventually left

the house with a gun. Parker testified at trial that Roberson told him to give Wilcox her gun back. Wilcox stopped by their house, driving a car with a person in the backseat who was not McIver, and Parker handed her the gun through the car window.

Video from a residential surveillance camera showed that Smith's vehicle travelled down Pate Street in Chatham County at approximately 1:40 p.m. and returned a few minutes later. About the same time, a nearby resident who lived near the end of Pate Street saw a vehicle fitting the description of Smith's drive to the end of the road and into a wooded area, heard a gunshot about three minutes later, and saw the vehicle leaving Pate Street. Location data from Wilcox's phone shows that, afterwards, she returned to the area of Savannah Gardens. At 3:50 p.m., McIver sent six "multimedia messages" – probably containing images or photos – from his phone to Wilcox, and one minute later, she responded, "Monsta braxy ass n***a."  Although the content of McIver's messages was not available on any phone records or extractions, the State argued at trial during its closing argument that Wilcox's

6

response likely was a positive affirmation of her own actions and that the messages likely contained images of Smith's murder because, when Wilcox was arrested, her phone contained a video of her committing an unrelated execution-style double-homicide with which she was later charged. A call on Wilcox's phone at 5:35 p.m. showed she was again near Parker's and Roberson's house, and Smith's cell phone was located on a nearby street that evening.

At 8:12 p.m. on April 16, 2020, Wilcox called 911 from near her residence to report a dead body in the woods past the dead end of Pate Street. A Savannah police officer responded and located a deceased person, later identified as Smith, on his knees face down on the ground 30 to 40 yards into the woods. A GBI medical examiner later determined Smith's death was a homicide caused by a single gunshot wound that entered the back of Smith's skull and exited the bridge of his nose. A forensics officer processed the scene and obtained swab samples of the computer cords used to bind Smith's hands behind his back. The lead detective, Jacob Schroyer, submitted these swabs to the GBI for DNA testing. On April 21,

7

officers located Smith's vehicle, the inside of which was covered in soot and smelled like gasoline, suggesting an attempt to burn the vehicle.

On the night following the murder and again on April 20, McIver used his phone to review news reports regarding shootings and homicide investigations in Savannah, including two specifically mentioning Pate Street, and an article about fires in Savannah. McIver also searched for information about a "car fire," searched his name on a website for obtaining background checks, and then searched "how do I find out if I have a warrant." In May 2020, Wilcox was arrested, and Detective Schroyer reviewed her phone records, observed that she had been communicating with McIver on the day of the murder, obtained a search warrant for McIver's phone, and conducted a non-custodial interview of McIver at police headquarters. During that interview, McIver confirmed his phone number and stated that, until two weeks ago, he had been working only odd jobs. McIver denied knowing Wilcox but subsequently said that he may have sold marijuana to her. McIver confirmed he was

8

still looking for a job on April 16 but denied having been to the Wells Fargo branch on Victory Drive and denied knowledge of Smith's vehicle or of the location of Pate Street. McIver then consented to a buccal swab for his DNA.

Based on a subsequent report from the GBI showing a DNA match between McIver and one of the cords used to bind Smith, Detective Schroyer obtained an arrest warrant for McIver. At a post-arrest interview of McIver in November 2020, Schroyer read McIver his *Miranda*[3] rights, and McIver agreed to speak with Schroyer. McIver denied killing anyone or being present when anyone was killed. When McIver said he wanted to make a phone call, Schroyer confirmed that McIver did not want to talk further. Schroyer said he would not waste any more of McIver's time but would "get [him] on [his] way." Schroyer then asked McIver, "What's your phone number real quick?" McIver gave Schroyer his new phone number, and the interview ended.

Because the GBI forensic biologist initially assigned to test the

---

[3] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

9

DNA samples could not complete the analysis due to the low level of DNA, the samples were sent to another GBI forensic biologist for analysis using TrueAllele software. Emily Boswell, who performed the analysis, stated that of the four samples taken from the cords used to bind Smith, only one contained a match to McIver, Parker, Roberson, or Wilcox. Boswell determined that a "DNA match was identified between" one swab and McIver and that the DNA match was, "approximately, one million times more probable than a coincidental match to an unrelated person in the population."

1. McIver contends that his trial counsel provided constitutionally ineffective assistance when he failed to make a timely request for the assistance of a forensic expert in DNA analysis in preparing for trial and reviewing the testing procedures used by the GBI, and when counsel failed to file a pre-trial motion challenging the reliability of the DNA test results pursuant to the evidentiary standard established in *Harper v. State*, 249 Ga. 519,

524-526 (1) (292 SE2d 389) (1982), for new scientific techniques.[4] The trial court rejected this claim, relying in part on trial counsel's choice to attack the reliability of the DNA evidence through cross-examination. Because McIver has failed to show that his counsel's performance was deficient, this claim of ineffective assistance fails.

To prevail on a claim of ineffective assistance, a defendant must prove both that the performance of his lawyer was deficient and that he was prejudiced by counsel's deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To satisfy the deficiency prong of the *Strickland* test, the defendant "must show that his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in light of prevailing professional norms." *Lofton v. State*, 309 Ga. 349, 360 (6) (846 SE2d 57) (2020). "This requires a defendant to overcome the strong presumption that counsel's performance fell within a wide range of reasonable professional

---

[4] Where, as here, the trial in a criminal case commenced before July 1, 2022, the *Harper* standard applies. See *Garrison v. State*, 319 Ga. 711, 725 (3) (b) (905 SE2d 629) (2024).

11

conduct, and that counsel's decisions were made in the exercise of reasonable professional judgment." *Scott v. State*, 306 Ga. 417, 419-420 (2) (831 SE2d 813) (2019) (citation and punctuation omitted). "Decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." *Thomas v. State*, 311 Ga. 706, 714 (2) (a) (859 SE2d 14) (2021) (citation and punctuation omitted). The defendant must also show that the deficient performance prejudiced the defense, which requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U. S. at 694 (III) (B). If an appellant "fails to meet his burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Williams v. State*, 315 Ga. 797, 806 (2) (884 SE2d 877) (2023).

"Typically, the decision whether to present an expert witness is a matter of trial strategy that, if reasonable, will not sustain a

claim of ineffective assistance." *Guzman-Perez v. State*, 310 Ga. 573, 577 (2) (853 SE2d 76) (2020) (citation and punctuation omitted). More specifically, how to respond to "the presentation of an expert witness by the opposing side," such as "whether to present counter expert testimony, to rely upon cross-examination, to forego cross-examination and/or to forego development of certain expert opinion, is a matter of trial strategy" that, if reasonable, cannot successfully establish a claim of ineffective assistance of counsel. *Birdow v. State*, 305 Ga. 48, 52 (2) (823 SE2d 736) (2019) (citation and punctuation omitted).

During trial, McIver's counsel filed a motion to permit video testimony of expert witnesses and an ex parte motion for funds to hire two forensic DNA experts. The next day, counsel subpoenaed Jarrett P. Ambeau to testify about forensic interpretation, and Dr. Greg Hampikian to testify regarding forensic analysis, testing, and collection. Counsel explained that he did not provide any written reports regarding the experts' findings because he did not have the funds approved and had not received the part of the GBI file needed

13

for them to write a report challenging the DNA evidence. Although the trial court admonished counsel for not having the two experts under subpoena and not having written reports until the State was "close to resting," the court granted the requested funds but denied the request for the testimony to be virtual. Counsel did not make any further effort to secure funds or the expert witnesses' attendance, and neither expert testified for the defense.

After the judgment of conviction was entered and a motion for new trial was filed, new appellate counsel filed both an amended motion for new trial and a motion for funds to obtain forensic expert testimony and a report on the DNA evidence. At the first hearing on McIver's motion for new trial, trial counsel testified that, although about 50 percent of his practice was criminal defense, he had never tried a case with DNA evidence in 27 years of practice but that he researched the issue, consulted several other attorneys, and eventually identified two experts on DNA evidence about a week prior to trial. Neither expert informed counsel initially that they needed additional material from GBI that had not been provided

through discovery, but neither expert was comfortable testifying without that material. Dr. Hampikian reviewed the evidence and educated counsel about DNA evidence while he waited for the court to approve his request for $2,500. After approval, Dr. Hampikian stated that it would cost $13,000 to fly him to Chatham County to testify in person. Despite the experts being unable to testify, counsel "was constantly being coached [by them] throughout the entire trial." Counsel was able to use their assistance for cross-examination of the State's experts about mixture comparison and statistical interpretation in DNA analysis, probabilistic genotyping, and secondary DNA transfer. That cross-examination led to concessions about those matters at trial and was the basis for a significant portion of counsel's closing argument.

Counsel also stated that he filed a demand for speedy trial at McIver's daily insistence even though they did not have all of the discovery yet, and he spoke with McIver about the need for an expert to challenge the DNA evidence and warned him about the dangers of filing the demand. Counsel testified that the speedy trial demand

was a major reason he was unable to obtain the experts' testimony and report. The trial court granted the defense funds for an expert pursuant to appellate counsel's motion.

At the second motion-for-new-trial hearing, Dr. Hampikian testified that trial counsel was unprepared and that he was ready to help prepare counsel for cross-examination and to fly down, but that he would be very honest with the court about the "level of preparation and communication and rush." He asserted that the "very low level" of DNA analyzed – five cells or less when typically an analyst prefers more than 200 cells for a profile – was below GBI's validation levels and would have created interpretation challenges but the analysis was "not impossible." If he had testified, Dr. Hampikian would have explained the high risk of secondary transfer and criticized the GBI experts for conflating the results of studies. When asked about mathematical errors in his report, he stated that he would provide a corrected report and that the errors would not change the bottom line of his report. He testified that the results from his software showed that the contributor percentage of

McIver's known profile matched that obtained during the GBI's testing. Dr. Hampikian acknowledged that the TrueAllele program is "good," that he relied on it to render opinions in other cases, and that he did not know whether the sample in one of those cases had more cells present than the ones in this case.

Dr. Hampikian's amended written report, which was submitted the day after the hearing, criticized Boswell's testimony and counsel's cross-examination of her and stated that it was "clear from the GBI validation that for low template samples with at least 3 contributors, minor contributor profiles are subject to false inclusion errors"; that it was not clear "GBI established during its validation that it can reliably interpret such low amounts of DNA in such complex mixture samples"; and that "GBI's validation study produced false inclusions with similar laboratory created control samples, though with lower match statistics."

(a) First, we address McIver's claim that his trial counsel should have obtained the assistance of DNA experts in preparing for trial and reviewing the GBI's testing procedures. The record shows

17

that counsel investigated and prepared for the DNA evidence in this case, that he used the help of the DNA experts to prepare for cross-examination, and that, given the time constraints caused by McIver's insistence on a speedy trial and the weaknesses of Dr. Hampikian's potential testimony, it was not unreasonable to rely on cross-examination of Boswell rather than present testimony from Dr. Hampikian. Considering all of the circumstances from counsel's perspective, and in the light of prevailing professional norms, we conclude that McIver has failed to show that counsel's strategic decision not to use the assistance of DNA experts in some additional way and not to present expert testimony about the DNA evidence was so unreasonable that no competent attorney would have chosen it. See *Hughs v. State*, 312 Ga. 606, 612-613 (2) (864 SE2d 59) (2021) (holding that the appellant failed to carry his burden of showing deficient performance where his trial counsel thoroughly investigated and prepared for the State's medical evidence and made the strategic decision to attack that evidence through a thorough cross-examination of the State's witnesses instead of

18

presenting the testimony of a competing medical expert who counsel was concerned would have made harmful concessions); *Guzman-Perez*, 310 Ga. at 577-578 (2) (holding that the appellant could not show deficient performance where his counsel made a strategic decision to undertake a thorough cross-examination of the State's medical expert instead of retaining his own expert). The fact that McIver and his appellate counsel "now disagree with the difficult decisions regarding trial tactics and strategy made by trial counsel does not require a finding that [McIver] received representation amounting to ineffective assistance." *Guzman-Perez*, 310 Ga. at 578 (2) (citation and punctuation omitted).

(b) Second, we turn to McIver's claim that trial counsel failed to file a pre-trial motion under *Harper* challenging the reliability of the DNA testing using the TrueAllele software. Citing *State v. Gates*, 308 Ga. 238 (840 SE2d 437) (2020), McIver recognizes that we have not yet addressed or approved the reliability and admissibility of TrueAllele analysis under the *Harper* standard. Indeed, although we discussed TrueAllele analysis in *Gates*, we

decided in that case only "that (1) the defendant had shown reasonable diligence in filing his extraordinary motion for a new trial based on TrueAllele analysis, and (2) the DNA evidence offered in that case was material and may well affect the outcome of the case," and we did not consider in that case "any challenge to the admissibility of the evidence." *Nundra v. State*, 316 Ga. 1, 15 (5) (885 SE2d 790) (2023) (holding that the appellant failed to show plain error in the decision to admit the TrueAllele analysis).

In this case, the trial court would have been authorized to conclude that Boswell's testimony showed the TrueAllele analysis was scientifically valid and that no other evidence contradicted her testimony. Boswell was one of the first GBI forensic biologists to be trained in the TrueAllele probabilistic genotyping software used in mixture interpretation. Boswell testified that probabilistic genotyping software like TrueAllele and the science behind it is generally accepted in the forensic community, that the general scientific principles and techniques involved are valid and capable of producing reliable results, that in analyzing the samples she

20

performed the scientific procedures in an acceptable manner, and that her analysis was peer reviewed. Boswell also testified that the GBI performed its own internal validation study that resulted in the policies and procedures used in analyzing DNA samples with TrueAllele, as well as the creation of different thresholds. On cross-examination, Boswell confirmed the importance of abiding by the policies and procedures and the thresholds established by the GBI's validation study of the TrueAllele software, as confirmed by the peer reviewer in each case. On motion for new trial, Dr. Hampikian's testimony, which conceded his own use of TrueAllele analysis, did not undermine its admissibility. Because McIver has not been able to show that filing a *Harper* motion would have been successful – in particular because his own proposed expert used TrueAllele analysis and did not undermine its scientific basis – we cannot say that trial counsel was deficient in failing to file such a motion. See *Santana v. State*, 308 Ga. 706, 712 (3) (a) (842 SE2d 14) (2020) (holding that trial counsel's failure to file a *Harper* motion to exclude fingerprint testimony was not deficient where the appellant had failed to show

that the fingerprint evidence presented by the State had not reached a scientific stage of verifiable certainty or that the specific fingerprint methodology or analysis used in that case was not scientifically supported).

2. McIver also contends that his trial counsel rendered ineffective assistance when he failed to move to suppress the portion of McIver's custodial statement occurring after he invoked his right to silence and that the trial court committed plain error by not suppressing that same portion of the custodial statement. Because the theory behind McIver's contention would require an extension of precedent, it cannot support a claim of either plain error or ineffective assistance.

McIver argues that the admission into evidence of Detective Schroyer's request for McIver's phone number and his reply stating his new phone number – all of which occurred, as described above, after McIver said he needed to make a phone call and affirmed that he did not want to talk further – violated his right to remain silent

under the Fifth Amendment to the United States Constitution.[5]

"[W]hen a person in the custody of law enforcement officers unambiguously and unequivocally invokes his right to remain silent in connection with their interrogation, the interrogation must cease immediately." *Davidson v. State*, 304 Ga. 460, 468-469 (4) (819 SE2d 452) (2018). However, that right – derived from the Fifth Amendment, see id. at 468 (4), and described in *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966) – is subject to an exception for general booking questions. Thus, "even after a defendant has invoked his rights, basic biographical questions" are excepted from *Miranda* "because such 'booking' questions are unrelated to the investigation and serve a legitimate administrative need and therefore do not qualify as 'interrogation.'" *State v. Pauldo*, 309 Ga. 130, 135 (2) (844 SE2d 829) (2020) (citation and punctuation omitted). Booking questions that Georgia courts have allowed

---

[5] McIver cites in passing the Georgia Constitution of 1983, Art. I, Sec. I, Par. XVI, but he makes no separate argument and cites no cases regarding the Georgia Constitution, and we therefore restrict our analysis to his claim under the federal constitution. See *Smallwood v. State*, 310 Ga. 445, 447 (2) n.2 (851 SE2d 595) (2020).

include those seeking "the suspect's name, age, address, educational background, marital status, and other information required to complete an arrest form." *Griffin v. State*, 311 Ga. 579, 587 (6) (858 SE2d 688) (2021) (citation and punctuation omitted). But we have not yet decided, and indeed have expressly declined to decide, whether a police officer may ask a suspect for his phone number under the booking exception. See id. Nor has the Supreme Court of the United States decided that question. Cf. *Pennsylvania v. Muniz*, 496 U. S. 582, 601-602 (III) (C) (110 SCt 2638, 110 LE2d 528) (1990) (four-justice plurality holding that a suspect's answers to "questions regarding [his] name, address, height, weight, eye color, date of birth, and current age" that "were not intended to elicit information for investigatory purposes" and "appear reasonably related to the police's administrative concerns" are "admissible because the questions fall within a 'routine booking question' exception").[6] Under United States Supreme Court and Georgia case law interpreting the

---

[6] We recently explained how difficult it is to say exactly what was the holding of *Muniz* on this point. See *Jenkins v. State*, 317 Ga. 585, 597 (2) (c) n.12 (894 SE2d 566) (2023).

Fifth Amendment, therefore, a decision that requesting the suspect's phone number does not come within the booking exceptions but amounts to interrogation would require an extension of precedent.

(a) As a result, McIver has failed to show that the performance of his trial counsel in not moving to suppress his exchange with Detective Schroyer about his new phone number was deficient. See *Smith v. State*, 313 Ga. 752, 757 (2) (a) (873 SE2d 142) (2022) ("[A] criminal defense attorney does not perform deficiently when he fails to advance a legal theory that would require an extension of existing precedents and the adoption of an unproven theory of law." (citation and punctuation omitted)). See also *Pugh v. State*, 318 Ga. 706, 722 (2) (d) (899 SE2d 653) (2024) ("Trial counsel . . . cannot be deemed ineffective for failing to argue precedent that was not in existence at the time of the trial." (citation and punctuation omitted)). Accordingly, McIver's claim of ineffective assistance fails.

(b) McIver also has failed to establish plain error.

To establish plain error, [the appellant] must show that he did not affirmatively waive the error, that the error is

25

> clear or obvious, rather than subject to reasonable dispute, that it affected his substantial rights, and that it seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Williams v. State*, 316 Ga. 304, 308 (1) (b) (888 SE2d 60) (2023).

Because McIver's theory regarding his exchange with Detective Schroyer about his new phone number would require an extension of precedent, the alleged error in admitting that exchange into evidence was not clear or obvious rather than subject to reasonable dispute. See id. ("As to the second part of the test, an error is plain if it is clear or obvious under current law. An error cannot be plain where there is no controlling authority on point or if a defendant's theory requires the extension of precedent." (citations and punctuation omitted)). For this reason, McIver's claim of plain error fails.

3. McIver's final contention is that the evidence was insufficient to support his conviction for armed robbery. The armed robbery count of the indictment charged that McIver and Wilcox, "with the intent to commit a theft, did unlawfully take a debit card, property of Brandon Smith, from the immediate presence of

26

Brandon Smith, by the use of a gun, an offensive weapon[.]" "The State therefore was required to prove beyond a reasonable doubt that [the] use of the handgun occurred prior to or contemporaneously with the taking" of the debit card. *Harrington v. State*, 300 Ga. 574, 577 (2) (a) (797 SE2d 107) (2017) (citation and punctuation omitted). Moreover, the "taking" of property "is not a continuing transaction which ends only when the defendant leaves the presence of the victim. Instead, the taking is complete once control of the property is transferred involuntarily from the victim to the defendant, even if only briefly." Id. (citation and punctuation omitted).

The State correctly concedes that the evidence in this case was not sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that McIver was guilty of armed robbery. Indeed, the evidence presented by the State, including all reasonable inferences, showed only that a gun was obtained and used well after the theft of the victim's debit card. Accordingly, the conviction for armed robbery must be reversed. See *Chavez v. State*, 307 Ga. 804,

27

808 (1) (b) (837 SE2d 766) (2020) (reversing a conviction for possession of a firearm by a first-offender probationer where the State correctly conceded it presented no evidence that the appellant possessed a firearm during the term of his probation and prior to his discharge); *Harrington*, 300 Ga. at 577-578 (2) (a) (reversing a conviction for armed robbery where the evidence was insufficient to support a finding beyond a reasonable doubt that the appellant used a handgun to take a cell phone from the victim); *Johnson v. State*, 288 Ga. 771, 773 (1) (a) (707 SE2d 92) (2011) (reversing a conviction for armed robbery where the evidence failed to establish whether the appellant "first took the debit card and then killed the victim or whether he killed the victim and then took the debit card").

Our reversal of the armed robbery conviction affects other aspects of the trial court's sentence: merging the aggravated assault count into the armed robbery conviction, running the kidnapping sentence consecutively to the armed robbery sentence, and in turn running the sentence for possession of a firearm during the commission of a felony consecutively to the kidnapping sentence.

Because we are reversing the armed robbery conviction, the aggravated assault count no longer can be merged into it but must instead be merged into the malice murder because both the malice murder and aggravated assault counts of the indictment alleged that the co-indictees committed the crime "by tying [Smith] up and shooting him," and "there is no evidence to suggest the occurrence of an aggravated assault independent of the act which caused the victim's death." *Miller v. State*, 309 Ga. 549, 552 (3) (847 SE2d 344) (2020). Moreover, the kidnapping sentence no longer can be run consecutively to the armed robbery sentence. Accordingly, we also remand the case to the trial court for resentencing consistent with this opinion. See, e.g., *Reed v. State*, 314 Ga. 534, 554 (9) (878 SE2d 217) (2022) ("[B]ecause [the appellant's] sentence for possession of a firearm during the commission of a felony . . . was run consecutively to his sentence in [a] [c]ount . . . which now stands vacated, we remand the case to the trial court for resentencing.").

*Judgment affirmed in part and reversed in part, and case remanded for resentencing. Peterson, CJ, Warren, PJ, and Bethel, McMillian, LaGrua, Colvin, and Pinson, JJ, concur.*

29